*56 Justice Alito
announced the judgment of the Court and delivered an opinion, in which The Chief Justice, Justice Kennedy, and Justice Breyer join.
In this case, we decide whether Crawford v. Washington, 541 U. S. 36, 50 (2004), precludes an expert witness from testifying in a manner that has long been allowed under the law of evidence. Specifically, does Crawford bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify? We also decide whether Crawford substantially impedes the ability of prosecutors to introduce DNA evidence and thus may effectively relegate the prosecution in some cases to reliance on older, less reliable forms of proof.
In petitioner’s bench trial for rape, the prosecution called an expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner’s blood. On direct examination, the expert testified that Cellmark was an accredited laboratory and that Cellmark provided the police with a DNA profile. The expert also explained the notations on documents admitted as business records, stating that, according to the records, vaginal swabs taken from the victim were sent to and received back from Cellmark. The expert made no other statement that was offered for the *57 purpose of identifying the sample of biological material used in deriving the profile or for the purpose of establishing how Cellmark handled or tested the sample. Nor did the expert vouch for the accuracy of the profile that Cellmark produced. Nevertheless, petitioner contends that the expert’s testimony violated the Confrontation Clause as interpreted in Crawford.
Petitioner’s main argument is that the expert went astray when she referred to the DNA profile provided by Cellmark as having been produced from semen found on the victim’s vaginal swabs. But both the Illinois Appellate Court and the Illinois Supreme Court found that this statement was not admitted for the truth of the matter asserted, and it is settled that the Confrontation Clause does not bar the admission of such statements. See id., at 59-60, n. 9 (citing Tennessee v. Street, 471 U. S. 409 (1985)). For more than 200 years, the law of evidence has permitted the sort of testimony that was given by the expert in this case. Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert. While it was once the practice for an expert who based an opinion on assumed facts to testify in the form of an answer to a hypothetical question, modern practice does not demand this formality and, in appropriate cases, permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts. See Fed. Rule Evid. 703. That is precisely what occurred in this case, and we should not lightly “swee[p] away an accepted rule governing the admission of scientific evidence.” Melendez-Diaz v. Massachusetts, 557 U. S. 305, 330 (2009) (Kennedy, J., dissenting).
We now conclude that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not *58 offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause. Applying this rule to the present case, we conclude that the expert’s testimony did not violate the Sixth Amendment.
As a second, independent basis for our decision, we also conclude that even if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation. The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. See Perry v. New Hampshire, 565 U. S. 228 (2012). The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a *59 particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial.
i—i
¡3>
On February 10, 2000, in Chicago, Illinois, a young woman, L. J., was abducted while she was walking home from work. The perpetrator forced her into his car and raped her, then robbed her of her money and other personal items and pushed her out into the street. L. J. ran home and reported the attack to her mother, who called the police. An ambulance took L. J. to the hospital, where doctors treated her wounds and took a blood sample and vaginal swabs for a sexual-assault kit. A Chicago Police detective collected the kit, labeled it with an inventory number, and sent it under seal to the Illinois State Police (ISP) lab.
At the ISP lab, a forensic scientist received the sealed kit. He conducted a chemical test that confirmed the presence of semen on the vaginal swabs, and he then resealed the kit and placed it in a secure evidence freezer.
During the period in question, the ISP lab often sent biological samples to Cellmark Diagnostics Laboratory in Ger-mantown, Maryland, for DNA testing. There was evidence that the ISP lab sent L. J.’s vaginal swabs to Cellmark for testing and that Cellmark sent back a report containing a male DNA profile produced from semen taken from those swabs. At this time, petitioner was not under suspicion for L. J.’s rape.
Sandra Lambatos, a forensic specialist at the ISP lab, conducted a computer search to see if the Cellmark profile matched any of the entries in the state DNA database. The computer showed a match to a profile produced by the lab from a sample of petitioner’s blood that had been taken after he was arrested on unrelated charges on August 3, 2000.
On April 17, 2001, the police conducted a lineup at which L. J. identified petitioner as her assailant. Petitioner was *60 then indicted for aggravated criminal sexual assault, aggravated kidnaping, and aggravated robbery. In lieu of a jury trial, petitioner chose to be tried before a state judge.
B
Petitioner’s bench trial began in April 2006. In open court, L. J. again identified petitioner as her attacker. The State also offered three expert forensic witnesses to link petitioner to the crime through his DNA. First, Brian Ha-pack, an ISP forensic scientist, testified that he had confirmed the presence of semen on the vaginal swabs taken from L. J. by performing an acid phosphatase test. After performing this test, he testified, he resealed the evidence and left it in a secure freezer at the ISP lab.
Second, Karen Abbinanti, a state forensic analyst, testified that she had used polymerase chain reaction (PCR) and short tandem repeat (STR) techniques to develop a DNA profile from a blood sample that had been drawn from petitioner after he was arrested in August 2000. She also stated that she had entered petitioner’s DNA profile into the state forensic database.
Third, the State offered Sandra Lambatos as an expert witness in forensic biology and forensic DNA analysis. On direct examination, Lambatos testified about the general process of using the PCR and STR techniques to generate DNA profiles from forensic samples such as blood and semen. She then described how these DNA profiles could be matched to an individual based on the individual’s unique genetic code. In making a comparison between two DNA profiles, Lambatos stated, it is a “commonly accepted” practice within the scientific community for “one DNA expert to rely on the records of another DNA expert.” App. 51. Lambatos also testified that Cellmark was an “accredited crime lab” and that, in her experience, the ISP lab routinely sent evidence samples via Federal Express to Cellmark for DNA testing in order to expedite the testing process and to *61 “reduce [the lab’s] backlog.” Id., at 49-50. To keep track of evidence samples and preserve the chain of custody, Lam-batos stated, she and other analysts relied on sealed shipping containers and labeled shipping manifests, and she added that experts in her field regularly relied on such protocols. Id., at 50-51.
Lambatos was shown shipping manifests that were admitted into evidence as business records, and she explained what they indicated, namely, that the ISP lab had sent L. J.’s vaginal swabs to Cellmark, and that Cellmark had sent them back, along with a deduced male DNA profile. Id., at 52-55. The prosecutor asked Lambatos whether there was “a computer match” between “the male DNA profile found in semen from the vaginal swabs of [L. J.]” and “[the] male DNA profile that had been identified” from petitioner’s blood sample. Id., at 55.
The defense attorney objected to this question for “lack of foundation,” arguing that the prosecution had offered “no evidence with regard to any testing that’s been done to generate a DNA profile by another lab to be testified to by this witness.” Ibid.
The prosecutor responded: “Pm not getting at what another lab did.” Id., at 56. Rather, she said, she was simply asking Lambatos about “her own testing based on [DNA] information” that she had received from Cellmark. Ibid. The trial judge agreed, noting, “If she says she didn’t do her own testing and she relied on a test of another lab and she’s testifying to that, we will see what she’s going to say.” Ibid.
The prosecutor then proceeded, asking Lambatos, “Did you compare the semen that had been identified by Brian Hapack from the vaginal swabs of [L. J.] to the male DNA profile that had been identified by Karen [Abbinanti] from the blood of [petitioner]?” Ibid.
Lambatos answered “Yes.” Ibid. Defense counsel lodged an objection “to the form of the question,” but the trial judge overruled it. Ibid. Lambatos then testified *62 that, based on her own comparison of the two DNA profiles, she “concluded that [petitioner] cannot be excluded as a possible source of the semen identified in the vaginal swabs,” and that the probability of the profile’s appearing in the general population was “1 in 8.7 quadrillion black, 1 in 390 quadrillion white, or 1 in 109 quadrillion Hispanic unrelated individuals.” Id., at 57. Asked whether she would “call this a match to [petitioner],” Lambatos answered yes, again over defense counsel’s objection. Id., at 58.
The Cellmark report itself was neither admitted into evidence nor shown to the factfinder. Lambatos did not quote or read from the report; nor did she identify it as the source of any of the opinions she expressed.
On cross-examination, Lambatos confirmed that she did not conduct or observe any of the testing on the vaginal swabs, and that her testimony relied on the DNA profile produced by Cellmark. Id., at 59. She stated that she trusted Cellmark to do reliable work because it was an accredited lab, but she admitted she had not seen any of the calibrations or work that Cellmark had done in deducing a male DNA profile from the vaginal swabs. Id., at 59-62.
Asked whether the DNA sample might have been degraded before Cellmark analyzed it, Lambatos answered that, while degradation was technically possible, she strongly doubted it had occurred in this case. She gave two reasons. First, the ISP lab likely would have noticed the degradation before sending the evidence off to Cellmark. Second, and more important, Lambatos also noted that the data making up the DNA profile would exhibit certain telltale signs if it had been deduced from a degraded sample: The visual representation of the DNA sequence would exhibit “specific patterns” of degradation, and she “didn’t see any evidence” of that from looking at the profile that Cellmark produced. Id., at 81-82.
When Lambatos finished testifying, the defense moved to exclude her testimony “with regards to testing done by *63 [Cellmark]” based on the Confrontation Clause. Id., at 90. Defense counsel argued that there was “no evidence with regards to . . . any work done by [Cellmark] to justify testimony coming into this ease with regard to their analysis.” Ibid. (alteration in original). Thus, while defense counsel objected to and sought the exclusion of Lambatos’ testimony insofar as it implicated events at the Cellmark lab, defense counsel did not object to or move for the exclusion of any other portion of Lambatos’ testimony, including statements regarding the contents of the shipment sent to or received back from Cellmark. See id., at 55, 56, 90. See also 385 Ill. App. 3d 359, 367-368, 895 N. E. 2d 961, 968 (2008) (chain-of-custody argument based on shipping manifests waived).
The prosecution responded that petitioner’s Confrontation Clause rights were satisfied because he had the opportunity to cross-examine the expert who had testified that there was a match between the DNA profiles produced by Cellmark and Abbinanti. App. 91. Invoking Illinois Rule of Evidence 703,[1] the prosecutor argued that an expert is allowed to disclose the facts on which the expert’s opinion is based even if the expert is not competent to testify to those underlying facts. She farther argued that any deficiency in the foundation for the expert’s opinion “[d]oesn’t go to the admissibility of [that] testimony,” but instead “goes to the weight of the testimony.” App. 91.
The trial judge agreed with the prosecution and stated that “the issue is . . . what weight do you give the test, not do you exclude it.” Id., at 94. Accordingly, the judge stated that he would not exclude Lambatos’ testimony, which *64 was “based on her own independent testing of the data received from [Cellmark].” Id., at 94-95 (alteration in original).
The trial court found petitioner guilty of the charges against him. The State Appellate Court affirmed in relevant part, concluding that Lambatos’ testimony did not violate petitioner’s confrontation rights because the Cellmark report was not offered into evidence to prove the truth of the matter it asserted. See 385 Ill. App. 3d, at 369, 895 N. E. 2d, at 969-970 (“Cellmark’s report was not offered for the truth of the matter asserted; rather, it was offered to provide a basis for Lambatos’ opinion”). The Supreme Court of Illinois also affirmed. 238 Ill. 2d 125, 939 N. E. 2d 268 (2010). Under state law, the court noted, the Cellmark report could not be used as substantive evidence. When Lambatos referenced the report during her direct examination, she did so “for the limited purpose of explaining the basis for [her expert opinion],” not for the purpose of showing “the truth of the matter asserted” by the report. Id., at 150, 939 N. E. 2d, at 282. Thus, the report was not used to establish its truth, but only “to show the underlying facts and data Lambatos used before rendering an expert opinion.” Id., at 145, 939 N. E. 2d, at 279.
We granted certiorari. 564 U. S. 1052 (2011).
H-i HH
A
The Confrontation Clause of the Sixth Amendment provides that, “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” Before Crawford, this Court took the view that the Confrontation Clause did not bar the admission of an out-of-court statement that fell within a firmly rooted exception to the hearsay rule, see Ohio v. Roberts, 448 U. S. 56, 66 (1980), but in Crawford, the Court adopted a fundamentally new interpretation of the confrontation right, hold *65 ing that “[testimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine,” 541 U. S., at 59. Crawford has resulted in a steady stream of new cases in this Court. See Bullcoming v. New Mexico, 564 U. S. 647 (2011); Michigan v. Bryant, 562 U. S. 344 (2011); Melendez-Diaz, 557 U. S. 305; Giles v. California, 554 U. S. 353 (2008); Davis v. Washington, together with Hammon v. Indiana, 547 U. S. 813 (2006).
Two of these decisions involved scientific reports. In Melendez-Diaz, the defendant was arrested and charged with distributing and trafficking in cocaine. At trial, the prosecution introduced bags of a white powdery substance that had been found in the defendant’s possession. The trial court also admitted into evidence three “certificates of analysis” from the state forensic laboratory stating that the bags had been “examined with the following results: The substance was found to contain: Cocaine.” 557 U. S., at 308 (internal quotation marks omitted).
The Court held that the admission of these certificates, which were executed under oath before a notary, violated the Sixth Amendment. They were created for “the sole purpose of providing evidence against a defendant,” id., at 323, and were “‘quite plainly affidavits,’” id., at 330 (Thomas, J., concurring). The Court emphasized that the introduction of the report to prove the nature of the substance found in the defendant’s possession was tantamount to “live, in-court testimony” on that critical fact and that the certificates did “precisely what a witness does on direct examination.” Id., at 311 (internal quotation marks omitted). There was no doubt that the certificates were used to prove the truth of the matter they asserted. Under state law, “the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance.” Ibid. (internal quotation marks omitted; emphasis deleted). On these facts, the Court said, *66 it was clear that the certificates were “testimonial statements” that could not be introduced unless their authors were subjected to the “‘crucible of cross-examination.’” Id., at 311, 317 (quoting Crawford, supra, at 61).
In Bullcoming, we held that another scientific report could not be used as substantive evidence against the defendant unless the analyst who prepared and certified the report was subject to confrontation. The defendant in that case had been convicted of driving while intoxicated. At trial, the court admitted into evidence a forensic report certifying that a sample of the defendant’s blood had an alcohol concentration of 0.21 grams per hundred milliliters, well above the legal limit. Instead of calling the analyst who signed and certified the forensic report, the prosecution called another analyst who had not performed or observed the actual analysis, but was only familiar with the general testing procedures of the laboratory. The Court declined to accept this surrogate testimony, despite the fact that the testifying analyst was a “knowledgeable representative of the laboratory” who could “explain the lab’s processes and the details of the report.” 564 U. S., at 674-675 (Kennedy, J., dissenting). The Court stated simply: “The accused’s right is to be confronted with the analyst who made the certification.” Id., at 657.
Just as in Melendez-Diaz, the forensic report that was “introduce[d]” in Bullcoming “contained] a testimonial certification, made in order to prove a fact at a criminal trial.” 564 U. S., at 657. The report was signed by the nontestifying analyst who had authored it, stating, “I certify that I followed the procedures set out on the reverse of this report, and the statements in this block are correct. The concentration of alcohol in this sample is based on the grams of alcohol in one hundred milliliters of blood.” App. in Bullcoming, O. T. 2010, No. 09-10876, p. 62. Critically, the report was introduced at trial for the substantive purpose of proving the truth of the matter asserted by its out-of-court author—namely, that the defendant had a blood-alcohol *67 level of 0.21. This was the central fact in question at the defendant’s trial, and it was dispositive of his guilt.
In concurrence, Justice Sotomayor highlighted the importance of the fact that the forensic report had been admitted into evidence for the purpose of proving the truth of the matter it asserted. She emphasized that “this [was] not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence.” 564 U. S., at 673 (opinion concurring in part) (citing Fed. Rule Evid. 703). “We would face a different question,” she observed, “if asked to determine the constitutionality of allowing an expert witness to discuss others’ testimonial statements if the testimonial statements were not themselves admitted as evidence.” 564 U. S., at 673.
We now confront that question.
B
It has long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks firsthand knowledge of those facts.
At common law, courts developed two ways to deal with this situation. An expert could rely on facts that had already been established in the record. But because it was not always possible to proceed in this manner, and because record evidence was often disputed, courts developed the alternative practice of allowing an expert to testify in the form of a “hypothetical question.” Under this approach, the expert would be asked to assume the truth of certain factual predicates, and was then asked to offer an opinion based on those assumptions. See 1 K. Broun, McCormick on Evidence § 14, p. 87 (6th ed. 2006); 1 J. Wigmore, Evidence § 677, p. 1084 (2d ed. 1923) (“If the witness is skilled enough, his opinion may be adequately obtained upon hypothetical data alone; and it is immaterial whether he has ever seen the per *68 son, place or thing in question” (citation omitted)). The truth of the premises could then be established through independent evidence, and the factfinder would regard the expert’s testimony to be only as credible as the premises on which it was based.
An early example of this approach comes from the English case of Beckwith v. Sydebotham, 1 Camp. 116, 170 Eng. Rep. 897 (K. B. 1807), where a party sought to prove the seaworthiness of a ship, the Earl of Wycombe, by calling as witnesses “several eminent surveyors of ships who had never seen the ‘Earl of Wycombe.’ ” Ibid. The opposing party objected to the testimony because it relied on facts that were not known to be true, but the judge disagreed. Because the experts were “peculiarly acquainted” with “a matter of skill or science,” the judge said, the “jury might be assisted” by their hypothetical opinion based on certain assumed facts. Id., at 117, 170 Eng. Rep., at 897. The judge acknowledged the danger of the jury’s being unduly prejudiced by wrongly assuming the truth of the hypothetical facts, but the judge noted that the experts could be asked on cross-examination what their opinion of the ship’s seaworthiness would be if different hypothetical facts were assumed. If the party that had called the experts could not independently prove the truth of the premises they posited, then the experts’ “opinion might not go for much; but still it was admissible evidence.” Ibid.
There is a long tradition of the use of hypothetical questions in American courts. In 1887, for example, this Court indicated its approval of the following jury instruction:
“As to the questions, you must understand that they are not evidence; they are mere statements to these witnesses . .. and, upon the hypothesis or assumption of these questions the witnesses are asked to give their [opinion]. You must readily see that the value of the answers to these questions depends largely, if not wholly, upon the fact whether the statements made in *69 these questions are sustained by the proof. If the statements in these questions are not supported by the proof, then the answers to the questions are entitled to no weight, because based upon false assumptions or statements of facts.” Forsyth v. Doolittle, 120 U. S. 73, 77 (internal quotation marks omitted).
Modern rules of evidence continue to permit experts to express opinions based on facts about which they lack personal knowledge, but these rules dispense with the need for hypothetical questions. Under both the Illinois and the Federal Rules of Evidence, an expert may base an opinion on facts that are “made known to the expert at or before the hearing,” but such reliance does not constitute admissible evidence of this underlying information. Ill. Rule Evid. 703; Fed. Rule Evid. 703. Accordingly, in jury trials, both Illinois and federal law generally bar an expert from disclosing such inadmissible evidence.[2] In bench trials, however, both the Illinois and the Federal Rules place no restriction on the revelation of such information to the factfinder. When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose. As we have noted, “[i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.” Harris v. Rivera, 454 U. S. 339, 346 (1981) (per curiam). There is a “well-established presumption” that “the judge [has] adhered to basic rules of procedure” when the *70 judge is acting as a factfinder. Id., at 346-347 (emphasis added). See also Gentile v. State Bar of Nev., 501 U. S. 1030, 1078 (1991) (Rehnquist, C. J., dissenting).
This feature of Illinois and federal law is important because Crawford, while departing from prior Confrontation Clause precedent in other respects, took pains to reaffirm the proposition that the Confrontation Clause “does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.” 541 U. S., at 59-60, n. 9 (citing Tennessee v. Street, 471 U. S. 409). In Street, the defendant claimed that the police had coerced him into adopting the confession of his alleged accomplice. The prosecution sought to rebut this claim by showing that the defendant’s confession differed significantly from the accomplice’s. Although the accomplice’s confession was clearly a testimonial statement, the Court held that the jurors could hear it as long as they were instructed to consider that confession not for its truth, but only for the “distinctive and limited purpose” of comparing it to the defendant’s confession, to see whether the two were identical. Id., at 417.
⅜—I i—i
A
In order to assess petitioner’s Confrontation Clause argument, it is helpful to inventory exactly what Lambatos said on the stand about Cellmark. She testified to the truth of the following matters: Cellmark was an accredited lab, App. 49; the ISP occasionally sent forensic samples to Cellmark for DNA testing, ibid.; according to shipping manifests admitted into evidence, the ISP lab sent vaginal swabs taken from the victim to Cellmark and later received those swabs back from Cellmark, id., at 52-55; and, finally, the Cellmark DNA profile matched a profile produced by the ISP lab from a sample of petitioner’s blood, id., at 55-56. Lambatos had personal knowledge of all of these matters, and therefore none of this testimony infringed petitioner’s confrontation right.
*71 Lambatos did not testify to the truth of any other matter concerning Cellmark. She made no other reference to the Cellmark report, which was not admitted into evidence and was not seen by the trier of fact. Nor did she testify to anything that was done at the Cellmark lab, and she did not vouch for the quality of Cellmark’s work.
B
The principal argument advanced to show a Confrontation Clause violation concerns the phrase that Lambatos used when she referred to the DNA profile that the ISP lab received from Cellmark. This argument is developed most fully in the dissenting opinion, and therefore we refer to the dissent’s discussion of this issue.
In the view of the dissent, the following is the critical portion of Lambatos’ testimony, with the particular words that the dissent finds objectionable italicized:
“Q Was there a computer match generated of the male DNA profile found in semen from the vaginal swabs of [L. J] to a male DNA profile that had been identified as having originated from Sandy Williams?
“A Yes, there was.” Post, at 124 (opinion of Kagan, J.) (quoting App. 56; emphasis added).
According to the dissent, the italicized phrase violated petitioner’s confrontation right because Lambatos lacked personal knowledge that the profile produced by Cellmark was based on the vaginal swabs taken from the victim, L. J. As the dissent acknowledges, there would have been “nothing wrong with Lambatos’s testifying that two DNA profiles—the one shown in the Cellmark report and the one derived from Williams’s blood—matched each other; that was a straightforward application of Lambatos’s expertise.” Post, at 129. Thus, if Lambatos’ testimony had been slightly modified as follows, the dissent would see no problem:
“Q Was there a computer match generated of the male DNA profile produced by Cellmark found in-semerr *72 from the-vaginal swabs of [L. J.] to a male DNA profile that had been identified as having originated from Sandy Williams?
“A Yes, there was.”[3]
The defect in this argument is that under Illinois law (like federal law) it is clear that the putatively offending phrase in Lambatos’ testimony was not admissible for the purpose of proving the truth of the matter asserted—i. e., that the matching DNA profile was “found in semen from the vaginal swabs.” Rather, that fact was a mere premise of the prosecutor’s question, and Lambatos simply assumed that premise to be true when she gave her answer indicating that there was a match between the two DNA profiles. There is no reason to think that the trier of fact took Lambatos’ answer as substantive evidence to establish where the DNA profiles came from.
The dissent’s argument would have force if petitioner had elected to have a jury trial. In that event, there would have been a danger of the jury’s taking Lambatos’ testimony as proof that the Cellmark profile was derived from the sample obtained from the victim’s vaginal swabs. Absent an evaluation of the risk of juror confusion and careful jury instructions, the testimony could not have gone to the jury.
This case, however, involves a bench trial, and we must assume that the trial judge understood that the portion of Lambatos’ testimony to which the dissent objects was not *73 admissible to prove the truth of the matter asserted.[4] The dissent, on the other hand, reaches the truly remarkable conclusion that the wording of Lambatos’ testimony confused the trial judge. Were it not for that wording, the argument goes, the judge might have found that the prosecution failed to introduce sufficient admissible evidence to show that the Cellmark profile was derived from the sample taken from the victim, and the judge might have disregarded the DNA evidence. This argument reflects a profound lack of respect for the acumen of the trial judge.[5]
To begin, the dissent’s argument finds no support in the trial record. After defense counsel objected to Lambatos’ testimony, the prosecutor made clear that she was asking Lambatos only about “her own testing based on [DNA] information” that she had received from Cellmark. App. 56. Recognizing that Lambatos’ testimony would carry weight only if the underlying premises could be established, the judge noted that “the issue is . . . what weight do you give the test [performed by Lambatos], not do you exclude it.” Id., at 94. This echoes the old statement in Beckwith that an expert’s opinion based on disputed premises “might not go for much; but still it [is] admissible evidence.” 1 Camp., at 117, 170 Eng. Rep., at 897. Both the Illinois Appellate Court and the Illinois Supreme Court viewed the record in this way, and we see no ground for disagreement.[6]
*74 Second, it is extraordinarily unlikely that any trial judge would be confused in the way that the dissent posits. That Lambatos was not competent to testify to the chain of custody of the sample taken from the victim was a point that any trial judge or attorney would immediately understand. Lambatos, after all, had absolutely nothing to do with the collection of the sample from the victim, its subsequent handling or preservation by the police in Illinois, or its shipment to and receipt by Cellmark. No trial judge would take Lambatos’ testimony as furnishing “the missing link” in the State’s evidence regarding the identity of the sample that Cellmark tested. See post, at 123 (opinion of Kagan, J.).
Third, the admissible evidence left little room for argument that the sample tested by Cellmark came from any source other than the victim’s vaginal swabs.[7] This is so because there is simply no plausible explanation for how Cellmark could have produced a DNA profile that matched Williams’ if Cellmark had tested any sample other than the one taken from the victim. If any other items that might have contained Williams’ DNA had been sent to Cellmark or were otherwise in Cellmark’s possession, there would have been a chance of a mixup or of cross-contamination. See *75 District Attorney’s Office for Third Judicial Dist. v. Osborne, 557 U. S. 52, 80 (2009) (Alito, J., concurring). But there is absolutely nothing to suggest that Cellmark had any such items. Thus, the fact that the Cellmark profile matched Williams—the very man whom the victim identified in a lineup and at trial as her attacker—was itself striking confirmation that the sample that Cellmark tested was the sample taken from the victim’s vaginal swabs. For these reasons, it is fanciful to suggest that the trial judge took Lambatos’ testimony as providing critical chain-of-custody evidence.
C
Other than the phrase that Lambatos used in referring to the Cellmark profile, no specific passage in the trial record has been identified as violating the Confrontation Clause, but it is nevertheless suggested that the State somehow introduced “the substance of Cellmark’s report into evidence.” Post, at 125 (Kagan, J., dissenting). The main impetus for this argument appears to be the (erroneous) view that unless the substance of the report was sneaked in, there would be insufficient evidence in the record on two critical points: first, that the Cellmark profile was based on the semen in the victim’s vaginal swabs and, second, that Cellmark’s procedures were reliable. This argument is both legally irrelevant for present purposes and factually incorrect.
As to legal relevance, the question before us is whether petitioner’s Sixth Amendment confrontation right was violated, not whether the State offered sufficient foundational evidence to support the admission of Lambatos’ opinion about the DNA match. In order to prove these underlying facts, the prosecution relied on circumstantial evidence, and the Illinois courts found that this evidence was sufficient to satisfy state-law requirements regarding proof of foundational facts. See 385 Ill. App. 3d, at 366-368, 895 N. E. 2d, at 967-968; 238 Ill. 2d, at 138, 939 N. E. 2d, at 275. We cannot review that interpretation and application of Illinois law. *76 Thus, even if the record did not contain any evidence that could rationally support a finding that Cellmark produced a scientifically reliable DNA profile based on L. J.’s vaginal swabs, that would not establish a Confrontation Clause violation. If there were no proof that Cellmark produced an accurate profile based on that sample, Lambatos’ testimony regarding the match would be irrelevant; but the Confrontation Clause, as interpreted in Crawford, does not bar the admission of irrelevant evidence, only testimonial statements by declarants who are not subject to cross-examination.[8]
It is not correct, however, that the trial record lacks admissible evidence with respect to the source of the sample that Cellmark tested or the reliability of the Cellmark profile. As to the source of the sample, the State offered conventional chain-of-custody evidence, namely, the testimony of the physician who obtained the vaginal swabs, the testimony of the police employees who handled and kept custody of that evidence until it was sent to Cellmark, and the shipping manifests, which provided evidence that the swabs were sent to Cellmark and then returned to the ISP lab. In addition, as already discussed, the match between the Cell-mark profile and petitioner’s profile was itself telling confirmation that the Cellmark profile was deduced from the semen on the vaginal swabs.
This match also provided strong circumstantial evidence regarding the reliability of Cellmark’s work. Assuming (for the reasons discussed above) that the Cellmark profile was based on the semen on the vaginal swabs, how could shoddy or dishonest work in the Cellmark lab[9] have resulted in the *77 production of a DNA profile that just so happened to match petitioner’s? If the semen found on the vaginal swabs was not petitioner’s and thus had an entirely different DNA profile, how could sloppy work in the Cellmark lab have transformed that entirely different profile into one that matched petitioner’s? And without access to any other sample of petitioner’s DNA (and recall that petitioner was not even under suspicion at this time), how could a dishonest lab technician have substituted petitioner’s DNA profile? Under the circumstances of this case, it was surely permissible for the trier of fact to infer that the odds of any of this were exceedingly low.
This analysis reveals that much of the dissent’s argument rests on a very clear error. The dissent argues that Lam-batos’ testimony could be “true” only if the predicate facts asserted in the Cellmark report were true, and therefore Lambatos’ reference to the report must have been used for the purpose of proving the truth of those facts. See post, at 126. But the truth of Lambatos’ testimony, properly understood, was not dependent on the truth of any predicate facts. Lambatos testified that two DNA profiles matched. The correctness of this expert opinion, which the defense was able to test on cross-examination, was not in any way dependent on the origin of the samples from which the profiles were derived. Of course, Lambatos’ opinion would have lacked probative value if the prosecution had not introduced other evidence to establish the provenance of the profiles, but that has nothing to do with the truth of her testimony.
The dissent is similarly mistaken in its contention that the Cellmark report “was offered for its truth because that is all such ‘basis evidence’ can be offered for.” Post, at 130; see also post, at 106 (Thomas, J., concurring in judgment) (“[Statements introduced to explain the basis of an expert’s opinion are not introduced for a plausible nonhearsay purpose”). This view is directly contrary to the current version *78 of Rule 703 of the Federal Rules of Evidence, which this Court approved and sent to Congress in 2000. Under that Rule, “basis evidence” that is not admissible for its truth may be disclosed even in a jury trial under appropriate circumstances. The purpose for allowing this disclosure is that it may “assis[t] the jury to evaluate the expert’s opinion.” Advisory Committee’s 2000 Notes on Fed. Rule Evid. 703, 28 U. S. C. App., p. 361. The Rule 703 approach, which was controversial when adopted,[10] is based on the idea that the disclosure of basis evidence can help the factfinder understand the expert’s thought process and determine what weight to give to the expert’s opinion. For example, if the factfinder were to suspect that the expert relied on factual premises with no support in the record, or that the expert drew an unwarranted inference from the premises on which the expert relied, then the probativeness or credibility of the expert’s opinion would be seriously undermined. The purpose of disclosing the facts on which the expert relied is to allay these fears—to show that the expert’s reasoning was not illogical, and that the weight of the expert’s opinion does not depend on factual premises unsupported by other evidence in the record—not to prove the truth of the underlying facts.
Perhaps because it cannot seriously dispute the legitimate nonhearsay purpose of illuminating the expert’s thought process, the dissent resorts to the last-ditch argument that, after all, it really does not matter whether Lambatos’ statement regarding the source of the Cellmark report was admitted for its truth. The dissent concedes that “the trial judge might have ignored Lambatos’s statement about the Cellmark report,” but nonetheless maintains that “the admission of that statement violated the Confrontation Clause even if the judge ultimately put it aside.” Post, at 131, n. 3. But in a bench trial, it is not necessary for the judge to stop *79 and make a formal statement on the record regarding the limited reason for which the testimony is admitted. If the judge does not consider the testimony for its truth, the effect is precisely the same. Thus, if the trial judge in this case did not rely on the statement iri question for its truth, there is simply no way around the proviso in Crawford that the Confrontation Clause applies only to out-of-court statements that are “use[d]” to “establis[h] the truth of the matter asserted.” 541 U. S., at 59-60, n. 9 (citing Street, 471 U. S. 409).
For all these reasons, we conclude that petitioner’s Sixth Amendment confrontation right was not violated.
D
This conclusion is entirely consistent with Bullcoming and Melendez-Diaz. In those cases, the forensic reports were introduced into evidence, and there is no question that this was done for the purpose of proving the truth of what they asserted: in Bullcoming that the defendant’s blood-alcohol level exceeded the legal limit and in Melendez-Diaz that the substance in question contained cocaine. Nothing comparable happened here. In this case, the Cellmark report was not introduced into evidence. An expert witness referred to the report not to prove the truth of the matter asserted in the report, i. e., that the report contained an accurate profile of the perpetrator’s DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner’s blood. Thus, just as in Street, the report was not to be considered for its truth but only for the “distinctive and limited purpose” of seeing whether it matched something else. 471 U. S., at 417. The relevance of the match was then established by independent circumstantial evidence showing that the Cellmark report was based on a forensic sample taken from the scene of the crime.
Our conclusion will not open the door for the kind of abuses suggested by some of petitioner’s amici and the dis *80 sent. See post, at 127-128; Brief for Richard D. Friedman as Amicus Curiae 20-21. In the hypothetical situations posited, an expert expresses an opinion based on factual premises not supported by any admissible evidence, and may also reveal the out-of-court statements on which the expert relied.[11] There are at least four safeguards to prevent such abuses. First, trial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine “scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.” Fed. Rule Evid. 702(a). Second, experts are generally precluded from disclosing inadmissible evi *81 dence to a jury. See Fed. Rule Evid. 703; People v. Pasch, 152 Ill. 2d 133, 175-176, 604 N. E. 2d 294, 310-311 (1992). Third, if such evidence is disclosed, the trial judges may, and under most circumstances must, instruct the jury that out-of-court statements cannot be accepted for their truth, and that an expert’s opinion is only as good as the independent evidence that establishes its underlying premises. See Fed. Rules Evid. 105, 703; People v. Scott, 148 Ill. 2d 479, 527-528, 594 N. E. 2d 217, 236-237 (1992). And fourth, if the prosecution cannot muster any independent admissible evidence to prove the foundational facts that are essential to the relevance of the expert’s testimony, then the expert’s testimony cannot be given any weight by the trier of fact.[12]
IV
A
Even if the Cellmark report had been introduced for its truth, we would nevertheless conclude that there was no *82 Confrontation Clause violation. The Confrontation Clause refers to testimony by “witnesses against” an accused. Both the noted evidence scholar John Henry Wigmore and Justice Harlan interpreted the Clause in a strictly literal sense as referring solely to persons who testify in court, but we have not adopted this narrow view. It has been said that “[t]he difficulty with the Wigmore-Harlan view in its purest form is its tension with much of the apparent history surrounding the evolution of the right of confrontation at common law.” White v. Illinois, 502 U. S. 346, 360 (1992) (Thomas, J., concurring in part and concurring in judgment). “[T]he principal evil at which the Confrontation Clause was directed,” the Court concluded in Crawford, “was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.” 541 U. S., at 50. “[I]n England, pretrial examinations of suspects and witnesses by government officials ‘were sometimes read in court in lieu of live testimony.’ ” Bryant, 562 U. S., at 353 (quoting Crawford, supra, at 43). The Court has thus interpreted the Confrontation Clause as prohibiting modern-day practices that are tantamount to the abuses that gave rise to the recognition of the confrontation right. But any further expansion would strain the constitutional text.
The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (1) They involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (2) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions. In all but one of the post-Crawford cases[13] in which a Confrontation Clause violation has been *83 found, both of these characteristics were present. See Bullcoming, 564 U. S., at 653 (certified lab report having purpose of showing that defendant’s blood-alcohol level exceeded legal limit); Melendez-Diaz, 557 U. S., at 308 (certified lab report having purpose of showing that substance connected to defendant contained cocaine); Crawford, supra, at 38 (custodial statement made after Miranda v. Arizona, 384 U. S. 436 (1966), warnings that shifted blame from declarant to accused).[14] The one exception occurred in Hammon v. Indiana, 547 U. S. 813, 829-832 (2006), which was decided together with Davis v. Washington, but in Hammon and every other post-Crawford case in which the Court has found a violation of the confrontation right, the statement at issue had the primary purpose of accusing a targeted individual.
B
In Mammon, the one case in which an informal statement was held to violate the Confrontation Clause, we considered statements elicited in the course of police interrogation. We held that a statement does not fall within the ambit of the Clause when it is made “under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.” 547 U. S., at 822. In Bryant, another police-interrogation case, we explained that a person who makes a statement to resolve an ongoing emergency is not acting like a trial witness because the declarant’s purpose is not to provide a solemn declaration for use at trial, but to bring an end to an ongoing threat. See 562 U. S., at 358, 361. We noted that “the prospect of fabrication ... is presumably significantly diminished” when a statement is made under such circumstances, id., at 361, and that reliability is a salient characteristic of a statement that falls outside the reach of the Confrontation Clause, id., at 358-359. We emphasized that if a *84 statement is not made for “the primary purpose of creating an out-of-court substitute for trial testimony,” its admissibility “is the concern of state and federal rules of evidence, not the Confrontation Clause.” Ibid.
In Melendez-Diaz and Bullcoming, the Court held that the particular forensic reports at issue qualified as testimonial statements, but the Court did not hold that all forensic reports fall into the same category. Introduction of the reports in those cases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial. There was nothing resembling an ongoing emergency, as the suspects in both cases had already been captured, and the tests in question were relatively simple and can generally be performed by a single analyst. In addition, the technicians who prepared the reports must have realized that their contents (which reported an elevated blood-alcohol level and the presence of an illegal drug) would be incriminating.
C
The Cellmark report is very different. It plainly was not prepared for the primary purpose of accusing a targeted individual. In identifying the primary purpose of an out-of-court statement, we apply an objective test. Bryant, 562 U. S., at 360. We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances. Ibid.
Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the ISP lab sent the sample to Cell-mark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner—or for that matter, anyone else whose *85 DNA profile was in a law enforcement database. Under these circumstances, there was no “prospect of fabrication” and no incentive to produce anything other than a scientifically sound and reliable profile. Id., at 361.
The situation in which the Cellmark technicians found themselves was by no means unique. When lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be. In some cases, a DNA profile may provide powerful incriminating evidence against a person who is identified either before or after the profile is completed. But in others, the primary effect of the profile is to exonerate a suspect who has been charged or is under investigation. The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating—or both.
It is also significant that in many labs, numerous technicians work on each DNA profile. See Brief for New York County District Attorney’s Office et al. as Amici Curiae 6 (New York lab uses at least 12 technicians for each case); People v. Johnson, 389 Ill. App. 3d 618, 627, 906 N. E. 2d 70, 79 (2009) (“[Approximately 10 Cellmark analysts were involved in the laboratory work in this case”). When the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures.
Finally, the knowledge that defects in a DNA profile may often be detected from the profile itself provides a further safeguard. In this case, for example, Lambatos testified that she would have been able to tell from the profile if the sample used by Cellmark had been degraded prior to testing. As noted above, moreover, there is no real chance that “sample contamination, sample switching, mislabeling, [or] fraud” could have led Cellmark to produce a DNA profile that falsely matched petitioner. Post, at 137 (Kagan, J., dissenting). At the time of the testing, petitioner had not yet been *86 identified as a suspect, and there is no suggestion that anyone at Cellmark had a sample of his DNA to swap in by malice or mistake. And given the complexity of the DNA molecule, it is inconceivable that shoddy lab work would somehow produce a DNA profile that just so happened to have the precise genetic makeup of petitioner, who just so happened to be picked out of a lineup by the victim. The prospect is beyond fanciful.
In short, the use at trial of a DNA report prepared by a modern, accredited laboratory “bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.” Bryant, supra, at 379 (Thomas, J., concurring in judgment).
⅜ ‡ ⅜
For the two independent reasons explained above, we conclude that there was no Confrontation Clause violation in this case. Accordingly, the judgment of the Supreme Court of Illinois is

Affirmed.

 Consistent with the Federal Rules, Illinois Rule of Evidence 703 provides as follows:
“The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.”

 But disclosure of these facts or data to the jury is permitted if the value of disclosure “substantially outweighs [any] prejudicial effect,” Fed. Rule Evid. 703, or “the probative value . . . outweighs the risk of unfair prejudice,” People v. Pasch, 152 Ill. 2d 133, 223, 604 N. E. 2d 294, 333 (1992). When this disclosure occurs, “the underlying facts” are revealed to the jury “for the limited purpose of explaining the basis for [the expert’s] opinion” and not “for the truth of the matter asserted.” Id., at 176, 604 N. E. 2d, at 311.

 The small difference between what Lambatos actually said on the stand and the slightly revised version that the dissent would find unobjectionable shows that, despite the dissent’s rhetoric, its narrow argument would have little practical effect in future cases. Prosecutors would be allowed to do exactly what the prosecution did in this case so long as then-testifying experts’ testimony was slightly modified along the lines shown above. Following that course presumably would not constitute a “prose-cutorial dodge,” “subterfuge,” “indirection,” the “neat trick” of “sneak-ling]” in evidence, or the countenancing of constitutional violations with “a wink and a nod.” See post, at 120, 132, 133, 128 (opinion of Kagan, J.).

 We do not suggest that the Confrontation Clause applies differently depending on the identity of the factfinder. Cf. post, at 130 (opinion of Kagan, J.). Instead, our point is that the identity of the factfinder makes a big difference in evaluating the likelihood that the factfinder mistakenly based its decision on inadmissible evidence.

 See post, at 130-131 (opinion of Kagan, J.) (“I do not doubt that a judge typically will do better than a jury in excluding such inadmissible evidence from his decisionmaking process. Perhaps the judge did so here” (emphasis added)).

 The dissent finds evidence of the trial judge’s confusion in his statement that petitioner is “ ‘the guy whose DNA, according to the evidence from the experts, is in the semen recovered from the victim’s vagina.’ ” Post, at 131 *74 (emphasis added). The dissent interprets the phrase “according to the evidence from the experts” as a reference to what one expert, Lambatos, said about the origin of the sample that Cellmark tested. In context, however, the judge's statement is best understood as attributing to Lam-batos nothing more than the conclusion that there was a match between the two DNA profiles that were compared. The foundational facts, that one of the profiles came from the defendant and that the other came from “‘the semen recovered from the victim’s vagina,”’ were established not by expert testimony but by ordinary chain-of-custody evidence.

 Our point is not that admissible evidence regarding the identity of the sample that Cellmark tested excuses the admission of testimonial hearsay on this matter. Compare post, at 108-109 (Thomas, J., concurring in judgment), with post, at 130-131 (Kagan, J., dissenting). Rather, our point is that, because there was substantial (albeit circumstantial) evidence on this matter, there is no reason to infer that the trier of fact must have taken Lambatos’ statement as providing “the missing link.”

 Applying the Due Process Clause, we have held that a federal court may determine whether a rational trier of fact could have found the existence of all the elements needed for conviction for a state offense, Jackson v. Virginia, 443 U. S. 307, 314 (1979), but petitioner has not raised a due process claim. And in any event, L. J.’s identification of petitioner as her assailant would be sufficient to defeat any such claim.

 See post, at 135-136 (Kagan, J., dissenting).

 See Advisory Committee’s 2000 Notes on Rule 703, at 361.

 Both Justice Thomas and Justice Kagan quote statements in D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence §4.10.1, pp. 196-197 (2d ed. 2011) (hereinafter New Wigmore), that are critical of the theory that an expert, without violating the Confrontation Clause, may express an opinion that is based on testimonial hearsay and may, in some circumstances, disclose that testimonial hearsay to the trier of fact. The principal basis for this criticism seems to be the fear that juries, even if given limiting instructions, will view the disclosed hearsay as evidence of the truth of the matter asserted. See id., at 196, n. 36 (referring reader to the more detailed discussion in Mnookin, Expert Evidence and the Confrontation Clause After Crawford v. Washington, 15 J. L. & Pol’y 791 (2007)); New Wigmore 197, and n. 39 (citing jury cases); Mnookin, supra, at 802-804, 811-813. This argument plainly has no application in a ease like this one, in which a judge sits as the trier of fact. In the 2012 Supplement of The New Wigmore, the authors discuss the present case and criticize the reasoning of the Illinois courts as follows:
“The problem with [the not-for-the-truth-of-the-matter argument accepted by the Illinois courts] is that Lambatos had to rely on the truth of the statements in the Cellmark report to reach her own conclusion. The claim that evidence that the jury must credit in order to credit the conclusion of the expert is introduced for something other than its truth is sheer fiction.” § 4.11.6, at 24 (emphasis added).
This discussion is flawed. It overlooks the fact that there was no jury in this case, and as we have explained, the trier of fact did not have to rely on any testimonial hearsay in order to find that Lambatos’ testimony about the DNA match was supported by adequate foundational evidence and was thus probative.

 Our discussion of the first ground for our decision cannot conclude without commenting on the Kocak case, which dramatically appears at the beginning of the dissent. In that case, a Cellmark lab analyst realized while testifying at a pretrial hearing that there was an error in the lab’s report and that the DNA profile attributed to the accused was actually that of the victim. The lesson of this cautionary tale is nothing more than the truism that it is possible for an apparently incriminating DNA profile to be mistakenly attributed to an accused. But requiring that the lab analyst or analysts who produced the DNA profile be called as prosecution witnesses is neither sufficient nor necessary to prevent such errors. Since samples may be mixed up or contaminated at many points along the way from a crime scene to the lab, calling one or more lab analysts will not necessarily catch all such mistakes. For example, a mistake might be made by a clerical employee responsible for receiving shipments of samples and then providing them to the lab’s technicians. What is needed is for the trier of fact to make sure that the evidence, whether direct or circumstantial, rules out the possibility of such mistakes at every step along the way. And in the usual course of authentication, defense counsel will have access to sufficient information to inquire into, question, or challenge the procedures used by a laboratory if this seems to be a prudent and productive strategy.

 Experience might yet show that the holdings in those cases should be reconsidered for the reasons, among others, expressed in the dissents the decisions produced. Those decisions are not challenged in this case and are to be deemed binding precedents, but they can and should be distinguished on the facts here.

 With respect to Crawford, see Davis v. Washington, 547 U. S. 813, 840 (2006) (Thomas, J., concurring in judgment in part and dissenting in part).