CHIN, J., Concurring.
I concur fully in the majority opinion, which I have signed. I write separately to explain why Dr. Lawrence’s testimony did not violate defendant’s federal confrontation rights under the United States Supreme Court’s recent decision in Williams v. Illinois (2012) 567 U.S._ [183 L.Ed.2d 89, 132 S.Ct. 2221] (Williams).
*628 Unfortunately, as the majority opinion explains (maj. opn., ante, at p. 618), the high court had a majority for its result in Williams, but there was no majority explanation for this result. It took a combination of two opinions— each containing quite different reasoning-—to achieve the majority result: (1) the plurality opinion authored by Justice Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer, and (2) Justice Thomas’s opinion concurring in the judgment. Neither the plurality’s nor Justice Thomas’s reasoning gained majority support. Indeed, a majority of the court (Justice Thomas and the four dissenters) disagreed with the plurality’s reasoning. (See People v. Lopez (2012) 55 Cal.4th 569 [discussed in maj. opn., ante, pp. 618-619].) This situation makes it difficult to determine what to make of that decision.
“When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, ‘the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ....’” (Marks v. United States (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 97 S.Ct. 990].) This rule does not work particularly well, if at all, unless “one opinion can be meaningfully regarded as ‘narrower’ than another,” that is, unless “one opinion is a logical subset of other, broader opinions.” (King v. Palmer (D.C.Cir. 1991) 292 U.S. App.D.C. 362 [950 F.2d 771, 781] (in bank).) Here, neither the plurality opinion nor Justice Thomas’s concurring opinion can be viewed as a logical subset of the other. Indeed, to some extent they are contradictory. One court has said that “[w]hen it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court.” (U.S. v. Alcan Aluminum Corp. (2d Cir. 2003) 315 F.3d 179, 189.) Is that the situation here? Are we to discern no law of the land from the Williams case? I do not believe so. We can discover the narrowest ground for a decision. We can discover a standard that commands majority support.
We know what the result was in Williams, supra, 567 U.S._[132 S.Ct. 2221]: The testimony at issue did not violate the confrontation clause. This is because a majority of the court so concluded. Four justices (the plurality) found no violation for their reasons. One justice (Justice Thomas) found no violation for his different reasons. This means that a majority of the Williams court would find no violation of the confrontation clause whenever there was no violation under the plurality’s and under Justice Thomas’s reasoning. This is exactly what happened in Williams itself. “We need not find a legal opinion which a majority joined, but merely ‘a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree.’ ” (U.S. v. Williams (9th Cir. 2006) 435 F.3d 1148, 1157 [unrelated opn.].) If there is no confrontation clause violation under both the *629 plurality opinion and Justice Thomas’s opinion, a majority of the high court’s Williams case would agree with the result—no confrontation clause violation. To adapt the Ninth Circuit’s analysis to this case, “we must identify and apply a test which satisfies the requirements of both Justice [Alito’s] plurality opinion and Justice [Thomas’s] concurrence.” (U.S. v. Williams, supra, 435 F.3d at p. 1157.)
Accordingly, we must determine whether there was a confrontation clause violation under Justice Thomas’s opinion and whether there was a confrontation clause violation under the plurality’s opinion. If there was no violation under both opinions, then the result (finding no confrontation clause violation) would command the support of a majority from the high court’s Williams case. Such a test satisfies the requirements of both the plurality opinion and Justice Thomas’s concurrence.
Justice Thomas would find no violation if the out-of-court statements lack the necessary formality and solemnity to be testimonial. (Williams, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2255] (conc. opn. of Thomas J.).) As the majority in this case explains, the statements here are not sufficiently formal to meet this test. (Maj. opn., ante, at pp. 619-620.)
The Williams plurality opinion stated two reasons for its finding of no confrontation clause violation. The second reason applies here. In the introductory portion of its opinion, the plurality summarized this second reason: “The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory.” (Williams, supra, 567 U.S. at p. __[132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) (All further citations to Williams will be to the plurality opinion unless otherwise indicated.)
Later, the plurality explained its reasoning in greater detail. It said that the “abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions.” (Williams, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2242], italics added.)
The Williams plurality cites cases involving reports that did have the purpose of accusing a targeted person of a crime, such as a report having the *630 purpose of showing the “defendant’s blood-alcohol level exceeded legal limit” or that a “substance connected to [the] defendant contained cocaine.” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2242].) But, the plurality said, the report in its case “is very different. It plainly was not prepared for the primary purpose of accusing a targeted individual. In identifying the primary purpose of an out-of-court statement, we apply an objective test. [Citation.] We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances. [Citation.]
“Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the [Illinois State Police] lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner—or for that matter, anyone else whose DNA profile was in a law enforcement database. Under these circumstances, there was no ‘prospect of fabrication’ and no incentive to produce anything other than a scientifically sound and reliable profile. [Citation.]” (Williams, supra, 567 U.S. at pp. - [132 S.Ct. at pp. 2243-2244], italics added.)
The plurality continued: “When lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be. In some cases, a DNA profile may provide powerful incriminating evidence against a person who is identified either before or after the profile is completed. But in others, the primary effect of the profile is to exonerate a suspect who has been charged or is under investigation. The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating—or both.” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2244].)
The out-of-court statements in the autopsy report that Dr. Lawrence relied on to form his opinion are not testimonial under this test. They did not have the primary purpose of accusing defendant or any other targeted individual of engaging in criminal conduct. The primary purpose of the portions of the report that Dr. Lawrence relied on was to describe the condition of the body. (See maj. opn., ante, at p. 619; cone. opn. of Werdegar, 1, ante, at pp. 624-625.) In describing the condition of the body, there was no prospect of fabrication or incentive to produce anything other than a scientifically reliable report. The purpose of this part of the autopsy report is “simply to perform [the pathologist’s] task in accordance with accepted procedures.” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2244].)
*631 The plurality opinion in Williams indicates that practical considerations helped inform its conclusion. “If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. [Citation.] The Confrontation Clause does not mandate such an undesirable development.” (Williams, supra, 567 U.S. at p. __. [132 S.Ct. at p. 2228].)
Similar practical considerations support finding that autopsy reports, or at least the objective, factual observations included in those reports, are not testimonial for these purposes. A holding that everything in autopsy reports is testimonial—and, accordingly, that only the pathologist who prepared the report may testify about it—would have serious adverse consequences. “Years may pass between the performance of the autopsy and the apprehension of the perpetrator. This passage of time can easily lead to the unavailability of the examiner who prepared the autopsy report. Moreover, medical examiners who regularly perform hundreds of autopsies are unlikely to have any independent recollection of the autopsy at issue in a particular case and in testifying invariably rely entirely on the autopsy report. Unlike other forensic tests, an autopsy cannot be replicated by another pathologist. Certainly it would be against society’s interests to permit the unavailability of the medical examiner who prepared the report to preclude the prosecution of a homicide case.” (People v. Durio (N.Y.Sup.Ct. 2005) 7 Misc.3d 729 [794 N.Y.S.2d 863, 869].) Much harm would be done to the criminal justice system, with little accompanying benefit to criminal defendants, if all reliance on autopsy reports were banned.
Justice Breyer discussed the practical considerations concerning autopsy reports in a separate concurring opinion in Williams. “[T]o bar admission of the out-of-court records at issue here could undermine, not fortify, the accuracy of factfinding at a criminal trial. Such a precedent could bar the admission of other reliable case-specific technical information such as, say, autopsy reports. Autopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial. Autopsies are typically conducted soon after death. And when, say, a victim’s body has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial? [Citations.] Is the Confrontation Clause ‘ “effectively” ’ to function ‘ “as a statute of limitations for murder” ’? [Citation.]” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2251] (conc. opn. of Breyer, J.).) Justice Breyer spoke only for himself, but his observations are entirely consistent with the plurality opinion that he joined.
*632 Some of the attendant circumstances in this case support the argument that the autopsy report was prepared with the primary purpose of accusing defendant of a crime. Unlike the situation in Williams, defendant was a suspect at the time the autopsy report was prepared. An investigator was present during the autopsy, and the pathologist had been told of defendant’s confession before the autopsy report was written. Although the plurality in Williams stated that the defendant in that case happened not to be a suspect or in custody at the time the report was prepared, nothing in its opinion suggests this is a requirement rather than merely one of the “surrounding circumstances” of which the court must take account. (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2243].) Because of these circumstances, a statement in the autopsy report expressing the opinion, for example, that the victim had been strangled for two minutes might have been prepared with the primary purpose of accusing a targeted individual. But here, Dr. Lawrence, the testifying witness, offered that opinion. Defendant had full opportunity to confront and cross-examine Dr. Lawrence regarding that opinion.
The autopsy report itself was not introduced into evidence. Rather, in forming his opinion, Dr. Lawrence merely relied on information regarding the condition of the body that was detailed in that report, such as that the victim’s larynx and hyoid bone had not been fractured. But these statements are objective observations of the type routinely placed into autopsy reports, whether or not a specific suspect exists. They are not statements with a primary purpose of accusing defendant, or anyone else, of criminal conduct. The fact that the larynx and hyoid bone were not broken, like most of the other observations memorialized in the report, “was not inherently inculpatory.” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2228].) There was no prospect of fabrication or incentive to produce anything other than an accurate description of the state of the body. (Id. at p. _ [132 S.Ct. at p. 2244].)
The trial court did not have to allow defendant to confront Dr. Bolduc, the pathologist who prepared the autopsy report, regarding his observations, including that the larynx and hyoid bone were not broken. Indeed, such confrontation would undoubtedly have been futile. It seems unlikely a pathologist who conducts many autopsies would specifically remember a detail such as that. If called to testify, Dr. Bolduc, like Dr. Lawrence, would undoubtedly have had to rely on the report, rather than his memory, in this regard. (See People v. Durio, supra, 7 Misc.3d at p. 736 [794 N.Y.S.2d at p. 869] quoted ante.) That is one of the purposes for preparing and preserving written autopsy reports.
For these reasons, I conclude the Williams plurality would find no confrontation clause violation in this case. Because Justice Thomas would *633 also find no confrontation clause violation, albeit for different reasons, we may not do so either. Dr. Lawrence’s reliance on portions of someone else’s autopsy report in forming his opinions did not violate defendant’s right to confront the witnesses against him.
Cantil-Sakauye, C. J., Baxter, J., and Werdegar, J., concurred.