WERDEGAR, J., Concurring.
I concur in the reasoning and result of the majority opinion, which I have signed. I write separately to explain in more *622 detail why the anatomical and physiological observations recorded by a forensic pathologist in an autopsy report should not be considered testimonial, as that term has been used in Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (Crawford) and its progeny.
As the majority explains (maj. opn., ante, at p. 619), the autopsy report by Dr. George Bolduc, who conducted the autopsy but did not testify at trial, was not admitted into evidence; the question of whether the autopsy report itself was testimonial is thus not before us. In addition, the testifying pathologist, Dr. Robert Lawrence, gave his own expert opinions as to the cause and manner of death rather than relaying those reached by Dr. Bolduc; hence, the question of whether such recorded conclusions are testimonial is also not before us. Like the majority, therefore, I focus exclusively on Dr. Lawrence’s repetition to the jury of anatomical and physiological observations Dr. Bolduc recorded in his report, upon which Dr. Lawrence based his conclusions. Of these, the most significant was Dr. Bolduc’s recorded observation that the victim’s larynx and hyoid bone were both unbroken, from which Dr. Lawrence concluded the victim was strangled for “a period of minutes . . . certainly more than two minutes.”[1] Dr. Lawrence’s opinion became, in turn, the basis for prosecutorial argument to the jury that the killing was intentional and premeditated.
The question of what out-of-court statements are and are not testimonial has divided the justices of the United States Supreme Court, whose decisions have not yet yielded a clear definition or test. But the justices have consistently considered two factors in deciding whether a given statement sufficiently resembles the English court abuses that gave rise to the confrontation clause, primarily the use at trial of witness statements obtained through ex parte examination: (1) the degree of formality or solemnity with which the statement was made and (2) the degree to which it was produced for use at trial. The more a statement resembles the “ ‘solemn declaration or affirmation’ ” that is testimony, commonly understood, and the more it was expected, when made, “ ‘to be used prosecutorially’ ... ‘at a later trial,’ ” the more centrally it is located within the “core class of ‘testimonial’ statements.” (Crawford, supra, 541 U.S. at pp. 51-52.)
Throughout the high court’s exploration of the issue, Justice Thomas has maintained that solemnity or formality is the sine qua non of the testimonial statement. This focus is demonstrated in his separate opinions in Davis v. Washington (2006) 547 U.S. 813, 838 [165 L.Ed.2d 224, 126 S.Ct. 2266] (cone. & dis. opn. of Thomas, J.) (Davis) and Michigan v. Bryant (2011) 562 *623 U.S. _, _ [179 L.Ed.2d 93, 131 S.Ct. 1143, 1167] (cone. opn. of Thomas, J.) (Bryant), both asserting that statements resulting from a witness’s informal conversation with police officers are not testimonial; in Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305, 330 [174 L.Ed.2d 314, 129 S.Ct. 2527] (conc. opn. of Thomas, J.) (Melendez-Diaz), where Justice Thomas concurred with the majority that certificates of chemical content were affidavits and hence testimonial; and in Williams v. Illinois (2012) 567 U.S. _,_[183 L.Ed.2d 89, 132 S.Ct. 2221, 2255] (Williams), where he argued a DNA profile report was not testimonial because it lacked solemnity and formality (id. at p._ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.)). Other opinions, primarily majority opinions, have relied on this factor as well. (See Crawford, supra, 541 U.S. at p. 53, fn. 4 [witness’s “recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition” of interrogation, and was hence testimonial]; Davis, supra, 547 U.S. at p. 830 [though not so formal as in Crawford, police questioning was “formal enough”]; Melendez-Diaz, supra, 557 U.S. at p. 310 [certificates of chemical content “are incontrovertibly a ‘ “solemn declaration or affirmation made for the purpose of establishing or proving some fact” ’ ”]; Bullcoming v. New Mexico (2011) 564 U.S._,_ [180 L.Ed.2d 610, 131 S.Ct. 2705, 2717] (Bullcoming) [though not sworn before a notary public, certificates were “[l]ike the Melendez-Diaz certificates . . . ‘formalized’ in a signed document”]; Williams, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2242] (plur. opn. of Alito, J.) [testimonial hearsay typically consists of “formalized statements such as affidavits, depositions, prior testimony, or confessions”].)
The critical hearsay statement in this case—Dr. Bolduc’s recorded observation that the victim’s larynx and hyoid bone were unbroken—lacked the solemnity and formality that characterize statements the high court deems testimonial. Although Dr. Bolduc signed and dated his autopsy report, it was not sworn or certified in a manner comparable to the chemical analyses in Melendez-Diaz and Bullcoming. The report contrasts in this respect with the coroner’s or attending physician’s “[certification and signature” on a death certificate, by which the declarant “attest[s] to [the] accuracy” of “the portion of the certificate setting forth the cause of death.” (Health & Saf. Code, § 102875, subd. (a)(7).) Though the cause of death declared on a death certificate is to be “in conformity with” the “facts ascertained” by autopsy or other investigation (Gov. Code, § 27491.5), the two documents, autopsy report and death certificate, are distinct, and only the latter bears a formal certification mandated by statute. Certainly, no certification or solemn attestation accompanied the portions of Dr. Bolduc’s autopsy report containing his observations as to the unbroken state of the decedent’s larynx and hyoid bone.
*624 In cases involving the declarations of percipient witnesses rather than laboratory reports, the high court has looked to the degree of formality and structure of the circumstances in which the statement was made, using this analysis to help determine whether the statement is akin to the products of ex parte examinations. (See Crawford, supra, 541 U.S. at pp. 50-53 & fn. 4 [contrasting nontestimonial “off-hand, overheard” remarks with the testimonial products of “structured” police interrogation]; Davis, supra, 547 U.S. at p. 830 [as in Crawford, formal police interrogation of witness bore a “ ‘striking resemblance’ ” to ex parte examinations]; Bryant, supra, 562 U.S. at p._[131 S.Ct. at p. 1155] [where “state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial,” resulting statements are considered testimonial].) Looking beyond the question of certification to the formality or lack thereof in the circumstances in which Dr. Bolduc’s anatomical observations were made and recorded, the statements again appear to lack the requisite formality.
As the majority observes, autopsy reports typically (and in this case) have two parts: “(1) the objective forensic autopsy with its findings including toxicological tests, special tests, microscopic examination, etc., and (2) the interpretations of the forensic pathologist including cause and manner of death.” (National Assn, of Medical Examiners, Forensic Autopsy Performance Stds. (2005, as amended Aug. 11, 2011) std. H31, p. 25 (hereafter NAME Standards); see maj. opn., ante, at p. 619.) Whatever one might say of the latter portion (again, that issue is not before us here because Dr. Lawrence testified to his own conclusions as to cause and manner of death, not to Dr. Bolduc’s), the former does not resemble the ex parte examinations of historical example or the structured police interrogations of Crawford and Davis. Though there is a structure to the autopsy examination process, it is largely that of a medical examination, not an interrogation. “Performance of a forensic autopsy is the practice of medicine.” (NAME Stds., supra, std. B4, p. 10.) A professionally prepared autopsy report should record the pathologist’s observations of the external examination and, where performed, the internal examination of the decedent’s body, with a description of all internal and external injuries observed “in sufficient detail to support diagnoses, opinions, and conclusions.” (Id., std. H31.8, p. 25.) The process of systematically examining the decedent’s body and recording the resulting observations is thus one governed primarily by medical standards rather than by legal requirements of formality or solemnity.
On the second factor going to a statement’s testimonial character, the primary purpose behind the statement’s production, a consensus appears to exist that a statement is more testimonial to the extent it was produced under circumstances making it likely to be used in place of live testimony at a future criminal trial. (See Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2243] (plur. opn. of Alito, J.) [“the primary purpose of the Cellmark report, *625 viewed objectively, was not to accuse petitioner or to create evidence for use at trial”]; id. at p._[132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.) [court has asked “whether a statement was made for the primary purpose of establishing ‘past events potentially relevant to later criminal prosecution’—in other words, for the purpose of providing evidence”]; Bullcoming, supra, 564 U.S. at p._[131 S.Ct. at p. 2717] [“A document created solely for an ‘evidentiary purpose’ . . . made in aid of a police investigation, ranks as testimonial.”]; Bryant, supra, 562 U.S. at p. _ [131 S.Ct. at p. 1155] [confrontation clause not implicated when “a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony”]; Melendez-Diaz, supra, 557 U.S. at p. 311 [observing that “under Massachusetts law the sole purpose of the affidavits was to provide ‘prima facie evidence of the composition, quality, and the net weight’ of the analyzed substance.”]; Davis, supra, 547 U.S. at p. 830 [statements made under formal police interrogation are “an obvious substitute for live testimony”].)
Assessing the degree to which Dr. Bolduc’s observations on the state of the victim’s larynx and hyoid bone were produced for use at trial, I conclude the nontestimonial aspects of these anatomical observations predominate over the testimonial. A California coroner or medical examiner[2] has, by statute, the duty of investigating certain categories of deaths, regardless of whether the death is also the subject of a criminal investigation. (Gov. Code, § 27491; see maj. opn., ante, at pp. 620-621.) Speaking generally, the coroner or medical examiner investigates a death “cooperatively with, but independent from, law enforcement and prosecutors” with the goal of producing a “neutral and objective medical assessment of the cause and manner of death.” (NAME Stds., supra, std. Al, p. 7.) The investigation of deaths through autopsies in appropriate cases “protects the public interest and provides the information necessary to address legal, public health, and public safety issues in each case.” (Id., std. B3, p. 9.)
To be sure, an autopsy physician documents his or her observations of the decedent’s injuries partly “to provide evidence for court,” but detailed documentation of the pathologist’s observations is also important “to support or refute interpretations” and “to serve as a record.” (NAME Stds., supra, std. E13, p. 15.) A competent autopsy physician describes the decedent’s observed injuries and condition as a matter of course; an autopsy report that lacked such documentation would not meet minimum professional standards. (Id., §§ D-F, pp. 13-21.) That Dr. Bolduc reported his findings concerning the condition of the victim’s larynx and hyoid bone primarily for use as trial evidence is doubtful.
*626 A statement should also be deemed more testimonial to the extent it was produced through the agency of government officers engaged in a prosecutorial effort, and less testimonial to the extent it was produced for purposes other than prosecution or without the involvement of police or prosecutors. “Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar.” (Crawford, supra, 541 U.S. at p. 56, fn. 7.) The high court has made clear a witness’s statement may be testimonial even if it does not by itself inculpate the defendant (Melendez-Diaz, supra, 557 U.S. at pp. 313-314), and a majority of the justices have rejected a very narrow definition of testimonial statements as limited to those “prepared for the primary purpose of accusing a targeted individual” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2243] (plur. opn. of Alito, J.); see id. at p._[132 S.Ct. at p. 2262] (cone. opn. of Thomas, J.); id. at pp. - [132 S.Ct. at pp. 2273-2274] (dis. opn. of Kagan, J.)). Nonetheless, the court’s Crawford jurisprudence suggests that testimonial character depends, to some extent, on the degree to which the statement was produced by or at the behest of government agents for use in a criminal prosecution.
As the court explained in Bryant, certain types of hearsay are considered nontestimonial because, having been produced primarily for purposes other than use in a criminal trial, they pose a significantly reduced “prospect of fabrication.” (Bryant, supra, 562 U.S. at p. _ [131 S.Ct. at p. 1157].) Among these are business and public records “ ‘created for the administration of an entity’s affairs.’ ” (Id. at p. __., fn. 9 [131 S.Ct. at p. 1157, fn. 9].) In contrast, when law enforcement agents solicit statements from witnesses for the purpose of using those statements against a person, the prospect for fabrication is at its greatest. Even without telling a witness what to say, government agents intent on building a criminal case against a suspect may consciously or unconsciously bias a witness’s responses by verbal and nonverbal cues. It is the accusatory context that makes the production of such out-of-court testimony especially dangerous and demands the resulting statements be considered “testimonial under even a narrow standard.” (Crawford, supra, 541 U.S. at p. 52; see id. at p. 53 [“The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace.”].) A process in which government agents may prompt a witness to make inherently inculpatory statements is more dangerous, and should more readily lead to classification of the statements as testimonial, than one in which a witness acts independently to record observations made as a regular part of the witness’s business or profession, even if those observations turn out to be helpful to the prosecution in a particular case.
*627 Focusing once more on Dr. Bolduc’s recorded observations on the decedent’s injuries, in particular the observation that her larynx and hyoid bone were unbroken, it does not appear Dr. Bolduc’s record of that observation was produced through a prosecutorial effort to obtain evidence against defendant, or anyone else, for use at trial. As previously discussed, a medical examiner’s duty to investigate the victim’s death is independent of any police inquiry or prosecutorial effort. (See U.S. v. Feliz (2d Cir. 2006) 467 F.3d 227, 237 [relying on medical examiner’s independent statutory duty “to conduct autopsies in various situations” to show autopsy report was nontestimonial public record].) While a police detective was apparently present at the autopsy, there is no evidence he asked Dr. Bolduc to investigate possible breaks in the victim’s larynx or hyoid bone, or to answer any other particular question about the condition of the decedent’s body. As a matter of standard practice, a competent autopsy physician will describe and document possible blunt force injuries to skeletal and other structures. (NAME Stds., supra, std. F24, p. 21.) The record does not show or suggest that Dr. Bolduc was prompted by prosecutorial agents to make any of the statements at issue, or indeed that he was guided in his conduct and documentation of the autopsy by anything other than professional medical practices and standards.
For the above reasons as well as those given by the majority, I conclude the trial court did not err in admitting Dr. Lawrence’s testimony over a confrontation clause objection. Dr. Lawrence relayed to the jury certain physical observations recorded by Dr. Bolduc in his report of the autopsy, using those observations to support Dr. Lawrence’s own expert opinions as to the cause and manner of death. Dr. Bolduc’s observations were introduced for their truth, and since Dr. Bolduc was not shown to be unavailable and had not been subject to prior cross-examination on this matter by defendant, his statements, were they testimonial, would have been inadmissible under Crawford. But because they neither bore sufficient indicia of formality or solemnity nor were produced primarily for use instead of live evidence at a criminal trial, they were not testimonial, and the confrontation clause did not bar their use. We need not decide here—and the majority does not decide— whether an autopsy report itself, or the examining pathologist’s conclusions as to cause and manner of death, would be similarly admissible without the testimony of the examining pathologist.
Cantil-Sakauye, C. J., Baxter, J., and Chin, J., concurred.

 Dr. Lawrence’s reasoning was that in the absence of a fracture that might have blocked the victim’s airway, it was “unlikely that she was just briefly squeezed and then let go and went on to die. I think there was pressure applied for a longer period.”

 A California county may choose to employ an appointed medical examiner in place of a coroner. In such a county, the medical examiner exercises the statutory powers and duties of the coroner. (Gov. Code, § 24010.)