OHLSON, Judge
(dissenting):
To be clear, I do not disagree with much of the analysis and many of the conclusions contained in the majority opinion. Rather, I diverge from the majority’s view of this ease in regard to just one point — but it is a point which I believe proves fatal to the Government’s position. Specifically, I believe Ap-pellee had a Sixth Amendment right to confront the initial laboratory technician, Mr. Fisher, regarding whether he precisely followed the required protocols for preparing the DNA samples, and thus whether he may have contaminated the evidentiary DNA sample with the known DNA sample. Because Appellee was not afforded this opportunity, and because I find an insufficient basis to conclude that the Government has met -its burden of demonstrating that this constitutional error was harmless beyond a reasonable doubt, I conclude that Appellee’s conviction must be reversed. Accordingly, I respectfully dissent.
It would be an understatement, indeed, to say that the Supreme Court’s decision in Williams v. Illinois, — U.S. -, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), where no single line of reasoning garnered a majority of the justices’ votes, has muddled the boundaries of an accused’s Sixth Amendment right “to be confronted with the witnesses against him.” U.S. Const, amend. VI (“In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him_”). This is particularly true in those instances where, as here, forensic results are a central point at trial, and questions arise pursuant to the Confrontation Clause regarding who must testify about the tests that were performed, the procedures *285 that were followed, and the results that were obtained. Indeed, the confusion that. Williams has sown seems to have consigned appellate courts such as ours to now view the issues that arise in these types of Confrontation Clause cases as “through a glass, darkly.” Nevertheless, I conclude that by analyzing other applicable precedents of the Supreme Court, as well as the jurisprudence of our own Court, answers to these questions may ultimately be discerned.
The majority does a thorough job of reciting the facts in this case, and therefore I will not repeat them in toto. Instead, I merely note the following points which I view as essential to the proper understanding and analysis of the issue before us.
First, Mr. Fisher handled and prepared for testing both the material that contained the evidentiary DNA samples and the material that contained the known DNA samples. As a result, there was a potential for contamination -of the two samples. This potential was significantly increased if Mr. Fisher did not precisely follow the. laboratory’s protocol when handling and preparing the samples, and such contamination would render meaningless any subsequent analysis.
Second, although Mr. Davenport compared the data from the two DNA samples that previously had been prepared by Mr. Fisher, he did not handle the original evidence that was submitted to the laboratory and did not independently prepare his own DNA samples for testing. Moreover, Mr. Davenport did not observe Mr. Fisher’s handling of the original evidence, nor did he observe Mr. Fisher’s preparation of these samples. Accordingly, Mr. Davenport’s “verification” that Mr. Fisher followed the required protocol consisted of reviewing Mr. Fisher’s written statements in the file in which Mr. Fisher asserted that he had done so.
Third, in motions practice, Appellee not only sought to require Mr. Fisher’s testimony at the court-martial, he also specifically cited as a basis for this demand his concern about potential contamination of the DNA samples. Appellee presumably wanted to question Mr. Fisher about the precise steps he took in preparing the samples, as well as to probe the credibility and reliability of this witness. As Justice Kagan noted in her dissenting opinion in Williams: “[A] defendant may wish to ask the analyst a variety of questions: How much experience do you have? Have you ever made mistakes in the past? Did you test the right sample? Use the right procedures? Contaminate the sample in any way?” 132 S.Ct. at 2275 (Kagan, J., dissenting, in which Sealia, Ginsburg, and Sotomayor, JJ., joined).
Fourth, despite Appellee’s articulation of his concern about contamination, the military judge denied Appellee the opportunity to confront Mr. Fisher at trial, essentially ruling that Mr. Davenport was an adequate substitute for Mr. Fisher and that his appearance satisfied the requirements of the Confrontation Clause.
Fifth, when Mr. Davenport appeared before the court-martial, he did not testify that if Mr. Fisher followed all of the required protocols and if Mr. Fisher did not commit any errors or mistakes, then, in his opinion, the DNA samples were properly handled and prepared and the results of the testing could be relied upon. Rather, Mr. Davenport merely assumed, without saying so, that Mr. Fisher’s written assertion in the file that he had not committed any mistakes or errors was true, and then testified before the panel members that the proper protocols were followed and that his own independent examination of the computer files relating to the samples prepared by Mr. Fisher demonstrated that the evidentiary sample matched the known sample.
In turning to my analysis of these facts and the applicable law, I first must emphasize that I do not contest the proposition that an appropriately credentialed individual may give expert testimony regarding data produced by another laboratory technician. United States v. Blazier (Blazier II), 69 M.J. 218, 222 (C.A.A.F.2010) (“[A]n expert may, consistent with the Confrontation Clause and the rules of evidence, (1) rely on, repeat, or interpret admissible and nonhearsay machine-generated printouts of machine-generated data, and/or (2) rely on, but not repeat, testimonial hearsay that is otherwise an ap *286 propriate basis-for an expert opinion, so long as the expert opinion arrived at is the expert’s own.” (citations omitted)). Further, I do not seek to suggest that every individual who touches DNA evidence as it progresses from the crime scene to the courthouse must testify at trial. See. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n. 1, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). Not at all.
On the other hand, however, I also note that it is a simple fact that “[f]orensic evidence is not uniquely immune from the risk of manipulation [and mistake].” Id. at 318, 129 S.Ct. 2527. Therefore, a defendant’s right to confront and cross-examine laboratory technicians regarding the steps they took in developing this forensic evidence may not be summarily curtailed merely because science and statistics are involved. To the contrary, an accused has the right to ask “questions designed to reveal whether [a lab analyst’s] incompetence ... or dishonesty” tainted the forensic results. Bullcoming v. New Mexico, — U.S. -, 131 S.Ct. 2705, 2715, 180 L.Ed.2d 610 (2011). In the instant case, Appellee was not afforded that right.
Mr. Davenport was an expert on, among other issues, what the laboratory protocols were in a case such as this one. However, he was not an expert on the issue of whether Mr. Fisher unerringly followed those protocols. Accordingly, Mi’. Davenport could use his expertise to examine and testify about such issues as the efficacy of the laboratory protocols, whether there were irregularities between the samples that were tested, whether the two samples matched one another, and the statistical likelihood that Appellee was the source of the evidentiary DNA. However, despite his expertise on these issues, in determining whether Mr. Fisher actually followed the protocols that were required of laboratory technicians, the underlying facts in this case show that Mr. Davenport relied on Mr. Fisher’s out-of-court written assurances that he had done so. This was testimonial hearsay. See Bullcoming, 131 S.Ct. at 2715 (stating that surrogate could not expose any lapses or lies on the certifying analyst’s part).
In analyzing this concern, I first note that Mr. Fisher’s routine written assurances in the file that he properly performed all the required procedures and did not commit any mistakes or errors did not carry with them any particular indicia of reliability. But more importantly, I further note that “ ‘reliability is no substitute for [the] right of confrontation.” Blazier II, 69 M.J. at 223. As the Supreme Court explained in Crawford v. Washington, “Where testimonial statements are involved, .... [the Confrontation Clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.” 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
Second, as pointed out by the majority, I acknowledge that these written assurances, along with Mr. Fisher’s other notes, the test results, and the written report, were not admitted into evidence, and therefore this ease does not squarely present the type of Confrontation Clause issues that the Supreme Court addressed in Bullcoming and Melendez-Diaz. Nevertheless, in my view, Mr. Davenport effectively repeated the out-of-court statements made by Mr. Fisher when he testified that Mr. Fisher had followed standard procedures in preparing the DNA samples — a putative fact about which Mr. Davenport had no independent knowledge. Moreover, when the military judge denied Appellee’s request to have Mr. Fisher testify, the military judge effectively rendered impervious to cross-examination and attack the issue of whether Mr. Fisher contaminated the evidentiary sample. See Bullcoming, 131 S.Ct. at 2715 n. 7. (an accused has a right to question a laboratory technician about his “proficiency, the care he took in performing his work, and his veracity”).
Accordingly, I conclude that Justice Ka-gan’s dissenting opinion in Williams, which managed to gamer the votes of four justices despite the highly fractured nature of the Court, neatly and succinctly captures the essence of what I believe to be still-controlling precedent in regard to the required analysis of cases such as the one before us:
Under our Confrontation Glause precedents, this is an open-and-shut case. The *287 State of Illinois prosecuted Sandy Williams for rape based in part on a DNA profile created in Cellmark’s laboratory. Yet the State did not give Williams a chance to question the analyst who produced that evidence. Instead, the prosecution introduced the results of Cellmark’s testing through an expert witness who had no idea how they were generated. That approach — no less (perhaps more) than the confrontation-free methods of presenting forensic evidence we have formerly banned — deprived Williams of his Sixth Amendment right to “eonfronft] ... the witnesses against him.”
Williams, 132 S.Ct. at 2265 (Kagan, J., dissenting, in which Scalia, Ginsburg, and Soto-mayor, JJ., joined) (alteration in original).
Moreover, I note that there are aspects of the instant ease that differ from the facts in the Williams case and, in my view, these differences serve to make the Confrontation Clause problem more acute here. First, in Williams the plurality seemed to place significant emphasis on the fact that the purpose of the laboratory DNA. profile was not “to create evidence for use at trial.” Id. at 2243. Justice Alito noted that at the time Cellmark analyzed the DNA sample, no one had been identified as the possible perpetrator of the offense and it was unclear that anyone would ever be arrested. Id. at 2243-44. Not so here. Mr. Fisher knew from the outset that an accused had been identified, and thus he knew that when he wrote his notes and conducted his tests, he likely was' “ereat[ing] evidence for use at trial.” Id. at 2245. This fact places Mr. Fisher’s statements “squarely within the heartland of Confrontation Clause jurisprudence.” United States v. Turner, 709 F.3d 1187, 1193 (7th Cir.2013).
Second, this was a court-martial with panel members rather than a military judge-alone trial. By the plurality’s own reckoning in Williams, this increased the chances that the trier of fact relied on the out-of-court statements implicit in Mr. Davenport’s testimony for their truth. See Williams, 132 S.Ct. at 2236 (“The dissent’s argument would have force if petitioner had elected to have a jury trial.”).
Although the Government elicited testimonial hearsay from Mr. Davenport, this does not end my Confrontation Clause inquiry. I next turn my attention to the Supreme Court’s decision in Crawford where, as the majority notes, the Court held that a prosecutor’s use of testimonial hearsay violates the Confrontation Clause — unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. 541 U.S. at 59, 124 S.Ct. 1354. I concede that this provides a significant exception to the Confrontation Clause in particular instances. However, I do not believe that the holding in Crawford is applicable to the instant case because I am not convinced that the record of trial supports the military judge’s finding that Mr. Fisher was unavailable to testify.
First, the military judge noted that based on communications with counsel, Mr. Fisher himself estimated that he would be available for witness interviews on “approximately Tuesday, 3 May 2011.” Because Appellee’s court-martial began on May 3, 2011, and continued through May 6, 2011, Mr. Fisher’s own estimation of his schedule made him available for questioning. Further, the military judge found as fact that Mr. Fisher would be “unable to travel to testify at the court-martial until 5 May 11 at the earliest.” Because the record reflects that Mr. Davenport, Mr. Fisher’s substitute, was not called to testify in this case until the evening of May 5, the military judge’s own findings indicate that Mr. Fisher likely was available to testify. Accordingly, I conclude that there was a Confrontation Clause violation under Crawford because Mr. Fisher should not have been considered unavailable to testify at Appellee’s trial.
And finally, I find that the DNA evidence was a central and integral element of the Government’s case against Appellee, and that the Government was unable to demonstrate that the constitutional error pertaining to that evidence was harmless beyond a reasonable doubt. Stated differently, I find that “ ‘there is a reasonable possibility that the evidence complained of might have contribuí- *288 ed to the conviction.’ ” Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)). Accordingly, I conclude that Appel-lee’s conviction must be reversed, and I respectfully dissent