# IN THE SUPREME COURT OF THE STATE OF NEVADA

JUSTIN CHASE FORSGREN, A/K/A
JUSTIN CHASE
VILLANOVAFORESGRENTHO,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 68906

FILED

SEP 2 1 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
DEPUTY CLERK

## *ORDER OF AFFIRMANCE*

This is an appeal from a judgment of conviction, pursuant to a jury verdict, of first-degree murder, child abuse and neglect with substantial bodily harm, and child abuse and neglect. Eighth Judicial District Court, Clark County; Michael Villani, Judge.

At issue in this appeal are a coroner's report containing, among other things, a forensic neuropathologist's findings, and the coroner's testimony related thereto. At trial, the coroner testified, but the forensic neuropathologist did not. We now consider whether the Sixth Amendment requires that the forensic neuropathologist must also testify. We conclude that the coroner may provide testimony relating *to* that report as an expert witness and, thus, the forensic neuropathologist need not testify. Because the district court concluded the same, we affirm.

17-31972

## FACTS AND PROCEDURAL HISTORY

*R.F.'s death*

On February 23, 2012, three-month-old R.F. suffered severe head trauma while home with Forsgren, her father.[1] Forsgren alleges he dropped R.F. while holding her, while the State contends the cause and manner of death was homicide by way of abusive head trauma, also known as shaken baby syndrome. Either way, moments later, R.F.'s mother and sister arrived at the apartment to find Forsgren administering CPR to R.F. Forsgren told R.F.'s mother to call 911. Eventually, R.F. was transported to the hospital.

Doctors determined R.F. suffered a traumatic head injury as evinced by subdural hematoma (bleeding on her brain), cerebral edema (swelling of the brain), and bi-lateral retinal hemorrhages (bleeding found behind both eyeballs). R.F.'s injuries caused concern among hospital employees—subdural hematoma, cerebral edema, and bi-lateral retinal hemorrhages, when found in conjunction, are known as the "triad" that is often indicative of abusive head trauma.[2] Once admitted to the hospital, R.F. was placed on life support. R.F. was removed from life support after two days, and died as a result of her brain injuries.

---

[1]R.F. was born prematurely and had medical conditions consistent with babies born at similar gestational periods. The parties dispute whether R.F. had a vitamin D deficiency that may have played a part in some of the skeletal injuries found in her autopsy. We conclude the issues in this appeal do not implicate most of R.F.'s medical conditions discussed in the briefing.

[2]The parties note there is some academic debate about the accuracy of diagnosing abusive head trauma solely based on finding the triad. *See, e.g.,* Keith A. Findley et al., *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting It Right* 12 Hous. J. Health L. & Policy 209, 213 (2012).

 

*The autopsy*

Due to the nature of R.F.'s death, the police were called. The police processed the body and took photographs before referring the case to the Clark County coroner for further investigation.

*The initial autopsy*

On February 26, 2012, Dr. Lary Simms performed R.F.'s autopsy and observed a number of internal injuries consistent with abusive head trauma. Simms observed bruising in the right occipital area, as well as bleeding on the surface of the brain and a subarachnoid hemorrhage over both lobes of the brain and between the lobes of the brain. Simms also found a hemorrhage in the soft tissue at the back of the left eye. Simms noted that the brain was swollen and softened because it had undergone brain death.

*Omalu's slides*

Simms removed the brain and sent it to an out-of-state lab run by Dr. Bennet Omalu, a forensic neuropathologist. Omalu was contracted to prepare brain tissue slides, which required Omalu to dissect the brain, place sections of the brain on slides, and stain the slides, as well as perform microscopic examinations to diagnose a diffuse axonal injury (DAI) in R.F.'s brain. DAI is a shearing of the axons of the nerve cells within the brain when there is a rapid acceleration and deceleration of the brain—most commonly found after a violent, rapid, shaking whiplash motion of the head. Omalu prepared the slides and forensic neuropathology report and sent them to Simms for his review.[3]

---

[3]We note that Forsgren requested and received the slides from the coroner's office in October, 2013.

Simms was initially unsatisfied with Omalu's report, and delayed the autopsy report until Omalu prepared an addendum to his report. Simms believed that Omalu's report inadequately described the DAI, and that Omalu may have lost some of the evidence mailed to him by the coroner's office. Eventually, Omalu supplemented his report.

*The trial*

On September 28, 2012, Forsgren was charged with murder and two counts of child abuse and neglect with substantial bodily harm. On May 13, 2014, Omalu was noticed as an expert witness. However, the State decided Omalu was "unnecessary for trial," and decided against calling him as a witness. On May 14, 2015, Forsgren first learned of the State's decision not to call Omalu and, in response, filed a motion in limine to preclude reference to and reliance on any testing, results, or opinions of any expert made in relation to the case unless said expert would be available for cross-examination. The district court heard argument on the motion and issued a written minute order denying Forsgren's motion. Forsgren subsequently filed two supplements to the motion in limine.[4]

The jury trial began on May 26, 2015. On the second day of trial, the district court determined that Simms could not testify to the findings made by Omalu, or rely on those findings in his testimony, and his testimony would be limited only to that of which he had firsthand knowledge. The district court reasoned that "[e]xperts may rely on

---

[4]Forsgren attached to the second motion in limine an email chain between the coroner's office and Omalu that allegedly raised questions concerning the methodology used by Omalu and reliability of his findings. The emails reference, among other things, the "imperative" need for Omalu to provide "[a] numbered list of the names of the specific anatomic areas in the brain and spinal cord involved with [DAI]" because Simms was going to be testifying in Forsgren's preliminary hearing later in the week.

otherwise inadmissible out-of-court statements as a basis for forming an expert opinion if they are of a kind that experts in the field normally rely upon" (quoting *Williams v. Illinois,* 567 U.S. 50, 88 (2012) (Breyer, J., concurring)) and that the issues raised by Forsgren ultimately go to the "weight and not the admissibility" of the evidence (citing *Brown v. Capanna,* 105 Nev. 665, 671, 782 P.2d 1299, 1304 (1989)).

*Simms' testimony*

Simms testified that that he performed a review of R.F.'s prenatal records and conducted his own examination and autopsy, as well as reviewing Omalu's report. He determined that the cause of death was abusive head trauma, and the manner of death was homicide.

Simms testified that he reviewed the slides taken of R.F.'s brain days prior to trial. Simms further testified that, having now reviewed those slides, the brain tissue slides showed DAI in R.F.'s brain. The DAI diagnosis discredited Forsgren's account of R.F.'s fall—Forsgren maintained that R.F. fell from his arms onto the floor of his apartment, approximately four to six feet, while DAI typically occurs in a fall from a more significant height. Simms indicated that the severity of the injuries suffered by R.F. were inconsistent with a fall of four to six feet as Forsgren described it. However, Simms testified that, while Omalu's slides demonstrated DAI, that finding did not alter his original opinion as to the cause and manner of death. Simms testified that, given the constellation of R.F.'s injuries, there was no other possible conclusion but that R.F. had suffered abusive head trauma.

Both Forsgren and the State instructed Simms several times to not testify to any of Omalu's analysis and to testify only to what Simms observed from Omalu's work.

 

*The verdict*

The jury found Forsgren guilty of first-degree murder, child abuse and neglect with substantial bodily harm, and child abuse and neglect. Forsgren was given concurrent sentences totaling 20 years to life. This appeal followed.

## DISCUSSION

*Forsgren's Sixth Amendment rights were not violated by Simms' testimony*

Forsgren argues the district court violated his Sixth Amendment right to confrontation by allowing Simms to testify concerning Simms' observations and conclusions after reviewing the brain slides and neuropathology report prepared by Omalu. The State argues Simms offered his own independent analysis of R.F.'s cause and manner of death and that the slides and report were documents of a kind that experts in the field normally rely upon, and thus do not require Omalu's testimony. We conclude the State is correct.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. A "primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). Accordingly, "the Confrontation Clause bars the use of a testimonial statement made by a witness who is unavailable for trial unless the defendant had an opportunity to previously cross-examine the witness regarding the witness's statement." *Medina v. State*, 122 Nev. 346, 353, 143 P.3d 471, 476 (2006) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). "[A] statement is testimonial if it would lead an objective witness to reasonably believe that the statement would be available for use at a later trial." *Id.* at 354, 143 P.3d at 476 (internal quotation marks omitted).

 

The constitutional limitations on out-of-court testimonial statements apply to surrogate testimony, especially testimony about forensic laboratory reports. *See Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329 (2009). Because a forensic laboratory report created specifically to serve as evidence in a criminal proceeding is testimonial, the prosecution may not introduce such a report without offering a live witness competent to testify to the truth of the report's statements. *See Melendez-Diaz*, 557 U.S. at 329. That testimony must not be surrogate testimony; rather, the testimony must be provided by the declarant who prepared the report. *See Bullcoming*, 564 U.S. at 661-62 (holding that the chance to confront only a surrogate witness does not satisfy the Sixth Amendment's strictures because surrogate testimony "could not convey what [the declarant] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed," and could not "expose any lapses or lies on the certifying analyst's part"); *see also* Andrew Arons, Comment, *Who Must Testify?: The Limits of the Confrontation Clause When It Is Applied to Forensic Laboratory Reports*, 46 Loy. L.A. L. Rev. 721, 721-24 (2013).

However, while a surrogate's testimony regarding a third-party laboratory report violates the Confrontation Clause to the extent that the report is admitted into evidence based on the surrogate's testimony, a surrogate can provide his "independent opinion as an expert witness." *Vega v. State*, 126 Nev. 332, 340, 236 P.3d 632, 638 (2010); *see also State v. Navarette*, 294 P.3d 435, 443 (N.M. 2013) ("[A]n expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause."). Indeed, "experts may rely on otherwise inadmissible out-of-court statements as a basis for forming an expert opinion if they are of a kind that experts in the field normally rely

upon." *Williams v. Illinois*, 567 U.S. 50, 88 (2012) (Breyer, J., concurring). This sort of testimony is allowed because

> [w]hen an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.

*Id.* at 58. Finally, experts may testify to matters within the scope of their "scientific, technical or other specialized knowledge," NRS 50.275, using facts "made known to the expert at or before the hearing." NRS 50.285(1).

We conclude that Simms offered his independent analysis as an expert. Simms made his own determination regarding the cause and manner of death based on his personal observations during the autopsy. That Simms ultimately concurred with Omalu's assessment of the slides does not implicate the Confrontation Clause. Indeed, Simms testified that Omalu's findings did not change his opinion as to the cause and manner of R.F.'s death. Additionally, both the State and Forsgren clarified their questions to Simms so as to not invoke a response that required testimony about Omalu—rather, the questions focused on Simms' observations and opinions. Simms underwent cross-examination about his findings, including the findings based upon the slides, and, thus, any issues regarding the reliability of the slides ultimately go to the weight and not the admissibility of the evidence. Accordingly, we conclude the district court did not violate Forsgren's confrontation rights in this respect.

We further conclude Omalu's report is the document of a kind that experts in the field normally rely upon and, thus, does not require him to appear to testify. Simms testified that when making an evaluation for

cause and manner of death, the coroner uses a variety of reports and data, including hospitalization records, physical examinations, brain tissue slides, and neuropathology reports, to assess the totality of the injuries sustained. We conclude this indicates that, even if the slides were otherwise inadmissible, Simms would be allowed to testify about their contents in his expert opinion. Therefore, we hold the district court did not violate Forsgren's confrontation rights in this respect.

*The district court did not violate Forsgren's Sixth Amendment right to confrontation by restricting the cross-examination of Simms*

Forsgren further argues his confrontation rights were violated because the district court did not allow cross-examination of Simms regarding Omalu's methodology. We disagree.

NRS 50.025 permits a witness to testify to matters of which "the witness has personal knowledge." Additionally, "[c]ross-examination is limited to the subject matter of the direct examination and matters affecting the credibility of the witness, unless the judge in the exercise of discretion permits inquiry into additional matters as if on direct examination." NRS 50.115(2). This court reviews a judge's decision about the scope of examinations for an abuse of discretion. *See Crawford v. State*, 121 Nev. 744, 758, 121 P.3d 582, 591 (2005).

We conclude cross-examination regarding Omalu's methods would have been inappropriate because Simms lacked personal knowledge of Omalu's methodology. Thus, questions regarding the reliability of Omalu's methodology would be outside the scope of a proper cross-examination. Additionally, there was extensive argument concerning the cross-examination of Simms on the procedures used by Omalu to create the brain slides. Ultimately, because the district court limited the scope of Simms' testimony to only his firsthand knowledge, Simms' testimony was restricted in a manner that did not allow for any discussion of Omalu's

Supreme Court
OF
Nevada

(O) 1947A

9

methods on cross-examination. Accordingly, we hold the district court did not abuse its discretion in this respect.

Additionally, we note that Forsgren received the slides nearly two years before trial and that Forsgren failed to subpoena Omalu or file a motion to continue the trial in order to procure him as a witness. Based upon the slides and the notice of the State's decision not to call Omalu to the stand, Forsgren could have called Omalu on direct examination to inquire about the reliability of his slides. However, the record reflects Forsgren's attorney advised the court the decision not to call Omalu was made for financial, rather than strategic, reasons—Forsgren's attorney told the district court the reason he would not call Omalu was because "[the public defender's] office won't pay to bring in Dr. Omalu. Just, I mean, so the Court's aware." For all the reasons set forth above, we conclude Forsgren's argument regarding the scope of his cross-examination of Simms lacks merit.

*Any error caused by testimony regarding Omalu's work was harmless*

Finally, we note that Forsgren's arguments seemingly hinge on the premise that Omalu's work was central to Forsgren's eventual conviction. This is not supported by the record. There was substantial medical testimony to support Simms' determination of the cause and manner of death from which the jury could have reached a guilty verdict beyond a reasonable doubt.

Simms performed substantial analysis outside of his review of Omalu's work. Simms testified that, in addition to the materials created by Omalu, he reviewed R.F.'s prenatal records and conducted his own examination and autopsy of R.F. to determine that her cause of death was abusive head trauma and the manner of death was homicide. Simms testified multiple times that no one injury or examination method informed

this determination; rather, he considered the injuries in the aggregate when making the final determination as to the cause and manner of R.F.'s death. Indeed, Simms personally observed a number of internal injuries consistent with abusive head trauma. During the autopsy, Simms observed bruising in the right occipital area, as well as bleeding on the surface of the brain and a subarachnoid hemorrhage over both lobes of the brain and between the lobes of the brain. Simms also found a hemorrhage in the soft tissue at the back of the left eye. Simms noted that the brain was swollen and softened because it had undergone brain death. Simms testified there was no "doubt in [his] mind" the constellation of injuries was caused by abusive head trauma.

Additionally, Dr. Neha Mehta, the doctor who treated R.F. when she was first admitted to the hospital, substantiated much of Simms' testimony. Mehta found hundreds of retinal hemorrhages to both of R.F.'s eyes. Mehta testified the type and quantity of retinal hemorrhages she observed are associated with severe abusive head trauma. Additionally, Mehta found swelling of the brain, and bleeding on the top surface of the brain in locations of the brain which are unlikely to occur from a single-location impact. Mehta determined that "what [R.F.] experienced would have been violent, rapid acceleration/deceleration of her head, like repeated whiplash motions of her head, snapping, and that would tear those veins and cause bleeding in all those various areas."

We conclude this testimony was subject to rigorous cross-examination and thus provided ample opportunity for the jury to make an informed verdict in this case. *See Allen v. State*, 99 Nev. 485, 488, 665 P.2d 238, 240 (1983) (holding that "jurors can either accept or reject [expert] testimony as they see fit"). We conclude this testimony provides substantial

 

evidence of the cause and manner of death and, thus, renders harmless any error caused by Omalu's failure to testify. Accordingly, we

ORDER the judgment of conviction AFFIRMED.

_____, C.J.
Cherry

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Stiglich

cc:    Hon. Michael Villani, District Judge
Clark County Public Defender
Attorney General/Carson City
Clark County District Attorney
Eighth District Court Clerk

