

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00172-CR

———————————————————

LAFRENCH MORRIS HILL, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1692224R

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

Appellant LaFrench Morris Hill challenges his conviction by a jury for the offense of arson with the intent to damage a habitation—an offense that is a first-degree felony. *See* Tex. Penal Code Ann. § 28.02(d)(2). The jury also answered affirmatively to a special question in the charge regarding whether he had "used or exhibited a deadly weapon, to wit: a combustible or flammable liquid or material" during the commission of the offense. The trial court imposed a sentence of fifteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

Appellant raises a single point on appeal in which he contends that his right to confrontation under the Sixth Amendment to the United States Constitution was violated when the trial court permitted an expert witness to opine that a fire-debris sample contained gasoline. Appellant predicates his issue on the fact that the technician who processed the sample for testing in a gas chromatograph did not testify, and Appellant was unable to cross-examine that person. We overrule Appellant's issue because the results generated by the gas chromatograph are not testimonial for purposes of the Confrontation Clause. Further, the expert who analyzed the results and formed the opinion that the gas chromatograph results indicated the presence of gasoline testified and was subject to cross-examination. Accordingly, we affirm the trial court's judgment.

## II.  Factual Background

The issue on appeal is narrow; thus, we will provide only a thumbnail sketch of the facts underlying the offense for which Appellant was convicted.  Appellant confronted the occupant of a garage apartment and claimed that the occupant of another apartment in the garage (the first occupant's brother) had sold Appellant "fake" drugs.  This confrontation triggered a series of events that led to the first occupant's leaving to find her brother, finding him, and dropping him off at another location; she then returned home to find the garage apartments engulfed in flames. While the first occupant had been away from the garage apartments, surveillance footage from a nearby convenience store captured Appellant's purchasing $2 of gas and a drink in a plastic bottle.  The video also showed Appellant's drinking the contents of the bottle, filling the bottle with gas, and then departing the convenience store a few minutes before the fire was reported.  Appellant does not challenge the sufficiency of the evidence from which the jury inferred that he had committed arson by setting the garage aflame.

Instead, the appeal focuses on the testing of a sample from the garage door— the location where the fire had started, according to the City's fire investigator.  A fire investigator acting for the insurance company that insured the burned structure took a sample from the door and sent that sample to a forensic-testing company— Armstrong Forensic Laboratory, Inc.

3

An employee and founder of the company to which the sample was sent, Dr. Andrew Armstrong, testified as an expert about the sample's testing. Dr. Armstrong began his testimony by outlining his educational background (including holding a PhD in chemistry and having once served as a college chemistry professor), the forty-year history of Armstrong Forensic Laboratory, and the certifications (including ones issued by the Texas Forensic Science Commission) held by both him and the company.

Dr. Armstrong then outlined how a sample delivered for testing is packaged and preserved once testing is complete. This testimony also outlined how the sample is prepared for testing in a gas chromatograph, the process that the sample undergoes while in the gas chromatograph to break down the sample's molecular structure, and how the machine records the compounds contained in the sample. Dr. Armstrong then outlined the history and evolution of the analytical process used.

Next, Dr. Armstrong described how the sample at issue was collected, tested, and stored. Prior to the admission of his report outlining his findings, a voir dire examination further explored the scientific acceptance of the testing method used and Dr. Armstrong's background in utilizing the testing method and analyzing the results of that testing method. During this examination, Dr. Armstrong offered the following explanation for the results generated by the gas chromatograph and how the results are interpreted:

A gas chromatograph mass spectrometer is, essentially, a universal device these days in forensic science. It is used in the analysis of drugs to establish the identity of the drug. The State of Texas uses a gas chromatograph mass spectrometer system to analyze marijuana for Delta 9 THC as a decision-point device.

It is widely accepted as providing information for two different things. One, it provides known compound retention. It knows the time. It also can identify the material from the mass spectrometer side and the mass spectra that it is a particular compound. Using that information, along with the standard ASTM 16 -- E1618 one produces a pattern of information that is unique to the ignitable liquid in question, whether it be gasoline, diesel, whatever.

Basically, the pattern of information looks like a city skyline to me, and you know that you are looking at gasoline because it has the same building pattern from your vantage point. You can change your vantage point and have two different columns, two different analysts, and you would still end up with the appropriate pattern for the knowns and standards.

The knowns and standards are in the file for this particular one. And with a little training, I can illustrate the results because they are crystal clear, and the pattern of information has been presented.

After the voir dire examination, the trial court overruled an objection that the witness's testimony lacked a proper predicate or that the opinions offered failed to qualify for admission under Texas Rule of Evidence 702.

At this point, the State's direct examination of Dr. Armstrong turned to the testing that was conducted on the gas chromatograph using known samples to ensure that the machine was operating properly. The question by the State that followed this explanation asked, "And were you able to generate a particular identifiable substance from this sample that you ran?" Dr. Armstrong responded "yes" to that question.

5

This question and answer prompted another request for voir dire examination by Appellant's counsel. Appellant's brief quotes the exchange that then occurred between his counsel and Dr. Armstrong. We set forth that exchange verbatim:

Q. Mr. Armstrong, did you actually -- the technique you just described, did you actually perform that technique in this case?

A. I run [that] in the laboratory all the time. This is back in 2018. As I sit here today, I cannot swear that I did this particular sample.

Q. Do you know who -- whose initials -- do you have anyone that worked at your lab --

A. We can look at the data and determine that.

Q. The initials JB, do you know who that would be? Joseph Belise -- I'm sorry, Joseph Belisle. Have you ever had someone named Joseph Belisle work at your lab?

A. I believe so. They printed out the data on the 31st, and it's been a while. I'm sorry, I don't recognize the initials.

Q. That's okay.

[Appellant's counsel]: Your Honor, may I approach the witness?

THE COURT: Sure.

Q. (By [Appellant's counsel]) I think I'm probably familiar with what you're looking at.

A. Good.

Q. I might can help you. I'm going to try to keep your pages in order.

A. They're numbered; no problem.

6

Q. Right there, and we can't -- the document I'm showing you right now where it says "Analyst"?

A. Okay.

Q. Do you see some initials there?

A. Yes, sir.

Q. Whose initials are those?

A. It says JB.

Q. And that would indicate that Joseph performed the analysis in this particular case; is that correct?

A. Well, we would assume Joseph. I don't recall the gentleman's name. I'm sorry.

Q. Okay. But that would have been --

A. What he did --

Q. Well, let me -- was --

Q. Hold on, Mr. Armstrong. That would have been the analyst [who] performed the test in this case or at least part of the test in this case?

A. That would be the technician [who] manipulated the sample under my direction.

The document from which counsel was reading was not introduced into evidence.

After his questioning of Dr. Armstrong, Appellant's counsel lodged an objection predicated on the Sixth Amendment and "Crawford."[1] Counsel explained the basis for the objection as follows: "The last question was related to the results of [these] tests, and so we object to that question and to any testimony about the results of any scientific tests that was based on analysis done by someone who I'm not able to cross-examine." The objection prompted a discussion between counsel and the trial court. After considerable discussion, the trial court focused the issue by asking the following:

> The [S]tate is attempting to offer his opinion based on what he has reviewed. In other words, the [S]tate is not attempting to adopt the conclusions of another through this witness. The [S]tate is attempting to have this witness give testimony based on what he's reviewed from another's work; is that correct?

The State indicated that was indeed its position.

After this exchange with the trial court, the examination of Dr. Armstrong by the State continued as follows:

> Q. Dr. Armstrong, were you able to analyze the results of the test on this particular substance, and were you able to come to a conclusion as to what substance was contained inside State's Exhibit 10 [the container containing the sample tested]?
>
> A. Yes, ma'am.
>
> Q. And what were you able to determine was the substance on State's Exhibit 10?

---

[1]Counsel was apparently using "Crawford" as a shorthand for *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359 (2004), because of its explication of principles underlying the Confrontation Clause.

A. The sample contained gasoline.

Q. Did you generate a report indicating these findings?

A. I did.

. . . .

Q. In other words, this report is generated based on the analysis done on this particular substance?

A. Yes, ma'am.

The State then offered Dr. Armstrong's report, to which Appellant lodged another objection based on the Sixth Amendment and "Crawford." The trial court overruled the objection. The report recorded Dr. Armstrong's opinions as follows:

*Methods of Analyses:*

Fire debris is examined in accordance with ASTM Methods E1412 and E1618. Recovery of ignitable liquids is by charcoal absorption with analysis by high-resolution capillary column Gas Chromatography-Flame Ionization (GC-FID) and Gas Chromatography/Mass Spectrometry (GC/MS) with computer comparison to the EPA/ NIST Database.

*Data Analysis and Interpretations:*

B8-4588A-001A [the identification code for the sample at issue] contains a refined petroleum fuel mixture identified as gasoline. Fresh gasoline typically ranges from $nC_4$-$nC_{12}$. Weathered, or concentrated, fuels show a loss of the more volatile components and can extend into the medium ($nC_8$-$nC_{13}$) and heavy ($nC_8$-$nC_{20}$) ranges. The recovery from the debris is identified as gasoline.

*Results and Conclusions:*

B8-4588A-001A, fire debris collected from west side door jamb and floor, contains gasoline.[2]

Dr. Armstrong went on to explain how heat stress changed the character of the gasoline. On cross-examination, Dr. Armstrong again described the person with the initials "JB" as a technician, and he was interrogated about the job history of the individual but not about his role in the testing of the sample at issue.

## III. Analysis

### A. We set forth the law on the right to confrontation.

The Court of Criminal Appeals recently offered the following summary of the source of the right to confrontation and explained what types of statements trigger the right to confrontation:

> The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against him. U.S. Const. amend. VI; *Crawford . . .* , 541 U.S. [at] 42, 124 S. Ct. [at 1359]; *Paredes*[ *v. State*], 462 S.W.3d [510,] 514 [(Tex. Crim. App. 2015)]. The Confrontation Clause applies to in-court testimony as well as out-of-court testimonial statements. Testimonial statements are those "that

---

[2]After introduction of the report, Dr. Armstrong reiterated that the report contained his analysis:

Q. (BY [prosecutor]) Dr. Armstrong, when you were analyzing this sample and you were able to determine that it was gasoline, was there anything specific that stood out to you about that particular sample of gasoline?

A. No. It is the extremely typical recovery of gasoline from a suspect fire. It has been significantly evaporated, heat stressed, and [it has] a trace level remaining.

10

were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." This includes some forensic analyses. *Paredes*, 462 S.W.3d at 514 (citing *Crawford*, 541 U.S. at 52, 124 S. Ct. [at 1364]).

*Molina v. State*, 632 S.W.3d 539, 543 (Tex. Crim. App. 2021).

## B.     We set forth the standard of review.

The overarching standard to determine whether a trial court erred by admitting testimony is abuse of discretion. *Downing v. State*, No. 02-19-00385-CR, 2020 WL 5833631, at *2 (Tex. App.—Fort Worth Oct. 1, 2020, no pet.) (mem. op., not designated for publication). However, the question of whether a statement is testimonial for purposes of the Confrontation Clause is one of law; thus, it is reviewed under a de novo standard. *Id.*

## C.     We explain whether there is a right to confrontation when there is testimony regarding forensic testing.

The Court of Criminal Appeals's recent writings establish the parameters of the Confrontation Clause's impact on testimony introducing the results of forensic testing and who in the testing process must be subject to cross-examination. *See Burch v. State*, 401 S.W.3d 634, 637–39 (Tex. Crim. App. 2013); *see also Molina*, 632 S.W.3d at 543–44; *Paredes*, 462 S.W.3d at 514–17.[3] We will not repeat the details regarding how the Court of Criminal Appeals synthesized its ruling or those of the United States

---

[3]In *Paredes*, the Court of Criminal Appeals analyzed the holdings of *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 309–11, 129 S. Ct. 2527, 2531–32 (2009), *Bullcoming v. New Mexico*, 564 U.S. 647, 651, 131 S. Ct. 2705, 2709 (2011), and *Williams v. Illinois*, 567 U.S. 50, 59–60, 132 S. Ct. 2221, 2229 (2012). 462 S.W.3d at 514–17.

Supreme Court, which the Court of Criminal Appeals looked to in formulating its holding. Instead, we note that the Court of Criminal Appeals concluded that the issue turns on the question of whether a forensic witness is offering his or her own analysis or simply parroting that of another who actually did the legwork in the analysis—in the terms used by the Court of Criminal Appeals, whether the work of a witness who is not subject to cross-examination is being presented by a "surrogate" in the form of the witness who is testifying. *Paredes*, 462 S.W.3d at 518.

The Court of Criminal Appeals summarized the general principles gleaned from the case law that guide the analysis regarding whether a defendant is deprived of the right to confrontation because a surrogate is testifying in the stead of the person who actually did the forensic analysis:[4]

> From these cases, several general principles are clear, assuming a defendant was afforded no prior opportunity to cross-examine[:]
>
> • The admission of a lab report created solely by a non-testifying analyst, without calling that analyst to sponsor it, violates the Confrontation Clause. Doing so deprives a defendant of his opportunity to cross-examine the non-testifying expert about the conclusions contained in the report and how the non-testifying expert arrived at those conclusions.
>
> • Additionally, testimony from an expert explaining that non-testifying analyst's report does not provide an adequate substitute for cross-examination even if the testifying expert is generally familiar with how the relevant analysis is customarily performed. When the testifying expert has no personal knowledge of how the testing was conducted, a

---

[4]We quote the Court of Court of Criminal Appeals's opinion verbatim, but we have changed the formatting of the quote for readability.

12

defendant still cannot adequately challenge through cross-examination the conclusion of that non-testifying analyst offered in that non-testifying analyst's report.

- For an expert's testimony based upon forensic analysis performed solely by a non-testifying analyst to be admissible, the testifying expert must testify about his or her own opinions and conclusions. While the testifying expert can rely upon information from a non-testifying analyst, the testifying expert cannot act as a surrogate to introduce that information.

*Id.* at 517–18.

Thus, the practical question in applying the Confrontation Clause to forensic testimony is how deeply the right to confrontation goes to those involved in the testing process. The third bulleted point in the preceding quote indicates that the right to confrontation does not require every person who slid a sample into a machine—even though the result produced was analyzed by the expert who testified—to appear and be subject to cross-examination. Indeed, we have previously reached that conclusion in the context of the results generated by the same type of machine that was used to generate the test result in the case under review. *See Downing*, 2020 WL 5833631, at *2.

In *Downing*, a gas chromatograph was used to test the blood sample of a defendant who had been charged with driving while intoxicated. *Id.* at *1. The person who ran the sample through the gas chromatograph did not testify; instead, testimony was provided by the analyst who had performed a technical review of the test result that had been obtained by another analyst. *Id.* The testifying analyst stated

"that her independent review of the raw data produced by the gas-chromatography testing led her to conclude" what the defendant's blood-alcohol level had been. *Id.* at *2. We held that the right to confrontation was satisfied because the analyst who "reviewed the nontestimonial raw data produced by the gas-chromatography test, verified the accuracy of the data, and explained her role in the testing process" was subject to cross-examination. *Id.* at *3 (footnote omitted). Further, we noted that the test result generated by the gas chromatograph was not "testimonial" for purposes of the Confrontation Clause because a machine is not subject to cross-examination. *Id.* A footnote in *Downing* marshaled the authority to support that holding:

> *See Paredes*, 462 S.W.3d at 519 (holding DNA profiles—"the raw, computer-generated data"—to be nontestimonial because data did not come from a witness capable of being cross-examined[] but were produced by a computer); *Torres v. State*, [609 S.W.3d 595, 600] (Tex. App.—Houston [14th Dist.] . . . 2020, [pet. ref'd]) (stating [that] "computer-generated DNA data" was nontestimonial because testifying analyst [had] formed an independent opinion); *Gore v. State*, 605 S.W.3d 204, [209] (Tex. App.—Beaumont 2020, no pet.) (holding [that] raw data from gas-chromatography test [was] not testimonial because "the machine did not create the results in anticipation of testifying at trial"). *See generally Bullcoming*, 564 U.S. at 654 n.1[, 131 S. Ct. at 2711 n.1] (explaining testing procedures and analyses required for gas chromatography).

*Id.* at *3 n.3.

We are confident that our analysis in *Downing* is correct because subsequent authority from the Court of Criminal Appeals turned on the same principle that we had relied on for our holding. *Molina*, 632 S.W.3d at 546. In *Molina*, the testifying expert relied on a report generated by another company. *Id.* The Court of Criminal

14

Appeals concluded that the report was not testimonial. *Id.* Standing on its own, the other company's report was not testimonial because it was not "inherently inculpatory" until an analysis was performed by the expert who testified; it was that witness's testimony that tied the data in the first report to the defendant. *Id.* And the witness who did testify was not merely acting as a surrogate for the person who generated the test results. *Id.* The witness offered his own analysis of what the test results revealed. *Id.*

To emphasize, an expert's ability to rely on raw data in forming an opinion does not mean that the expert may simply be a cipher for the machine-generated result produced by another. Thus, the witness must offer his or her own analysis of the raw data and not merely vouch for a report that is itself an analysis of the data. *Paredes*, 462 S.W.3d at 518 (stating that "this case is distinguishable from prior cases because the testifying expert in this case relied upon raw, computer-generated data in reaching her conclusion rather than another laboratory analyst's report").

Nor do courts allow a witness to blindly adopt the machine's results as a surrogate for the witness's analysis. Though the Court of Criminal Appeals has noted that the Confrontation Clause does not require a defendant to be able to drill down to any depth to test the accuracy of a machine-generated result,[5] it appears that the right

---

[5]As the court noted,

> Additionally, this case does not present the human-error problem this Court observed in *Burch*. In *Burch*, the defendant had no opportunity to

to confrontation about the machine's accuracy is satisfied if the witness can testify that checks were in place to ensure that the results were accurate. *Id.* (stating that the witness "testified about the safety measures in place at [the company that conducted the testing] to detect such errors and stated that, if part of the analysis were done improperly, the laboratory procedure would not generate an incorrect DNA profile" and that "[t]he testing would yield no result at all rather than an improper result").

At bottom, experts often rely on others' data to form their opinions. The Confrontation Clause does not stifle an expert's ability to rely on others' data but ensures that a defendant has the right to confront the person who actually made the analysis, and that right is not satisfied when the witness parrots the *ipse dixit* of another expert or of a machine. *See, e.g.*, *Johnson v. State*, 605 S.W.3d 843, 848–49 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) ("[T]he Confrontation Clause is not violated merely because an expert bases an opinion on inadmissible hearsay[] because the testifying expert's opinion is not hearsay and the testifying expert is available for cross-examination regarding his opinion.").

---

challenge the opinion of the testifying reviewer because that witness "could not verify that the results were properly generated." . . . 401 S.W.3d at 637. Appellant contends that the analysts could misreport information or mishandle the samples, but the Supreme Court has held that the Confrontation Clause does not mandate "that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device" must testify.

*Paredes*, 462 S.W.3d at 518.

**D. Appellant was not deprived of his right to confrontation in this case because Dr. Armstrong offered his own analysis regarding why the gas chromatograph results of the sample provided to his company indicated the presence of gasoline.**

Appellant formulates his argument based on the premise that the forensic witness, Dr. Armstrong, was a surrogate for the work of another. The following arguments in Appellant's brief crystalize his view that Dr. Armstrong was parroting the work of another or was simply a detached observer of the analysis of the sample:

> Here, the State's witness, Andrew Armstrong, who sponsored the report, admitted that the analysis of the known debris sample was performed by a person named "J.B. or Joseph Belisle," who did not testify at trial.
>
> . . . .
>
> Here, Dr. Armstrong's testimony regarding the circumstances surrounding the analysis of the fire[-]debris samples does not even rise to the level of testimony rejected by the Supreme Court, as under the circumstances, Dr. Armstrong was more akin to a bystander lay witness, being that he was not present during the analysis of the fire[-]debris samples at any point.

As with any testimony, there are aspects of the expert's testimony that could have been clearer, but Appellant overplays the hand dealt by the record when he contends that Dr. Armstrong admitted that the analysis of the sample was performed by another or that "he was not present during the analysis of the fire[-]debris samples at any point." Nor does Appellant ever acknowledge the principle that so long as an expert offers his own analysis of the data, the raw data analyzed is not testimonial, and a defendant is not deprived of the right to confrontation if the person who generated the underlying data does not testify.

From a factual standpoint, Dr. Armstrong did not testify that he had nothing to do with the testing of the sample. Admittedly, he could not remember whether he had tested "this particular sample" three years before trial. But he was clear what the role was of Mr. Belisle, whose initials were highlighted in counsel's cross-examination and whom Appellant argues performed the analysis of the debris sample. In Dr. Armstrong's words, Mr. Belisle was "the technician [who] manipulated the sample under my direction." Again, Dr. Armstrong testified that the sample was manipulated under his direction. Leaving the record undeveloped, Appellant chose not to explore the extent of the direction provided by Dr. Armstrong to the technician. But as the testimony stands, Dr. Armstrong indicated that he had a direct role in the gas chromatograph testing.[6]

Also, Appellant's characterization of Dr. Armstrong as a bystander simply ignores his testimony regarding what he had examined from the results generated by the gas chromatograph. He testified that he was "able to analyze the results of the test on this particular substance[] and [was] able to come to a conclusion as to what substance was contained" in the tested sample and that he had authored a report stating his own conclusions. Though he does not explicitly say so, Appellant is

---

[6]This testimony also rebuts Appellant's argument citing *Burch*, 401 S.W.3d at 637, that "[t]he person who testified at trial lacked personal knowledge about whether the tests on the fire[-]debris samples were done correctly or whether the analyst fabricated the results." Again, Dr. Armstrong indicated that he had a direct role in the gas chromatograph testing and was not simply being handed a test result that he accepted at face value and without question.

apparently trying to argue that Dr. Armstrong's testimony violates the principle set out in *Paredes* that "[w]hen the testifying expert has no personal knowledge of how the testing was conducted, a defendant still cannot adequately challenge through cross-examination the conclusion of that non-testifying analyst offered in that non-testifying analyst's report." *See* 462 S.W.3d at 517–18. The record is contrary to such an argument.

Admittedly, we do not know what the gas chromatograph results—even if those were the work of Mr. Belisle—actually looked like. But that is a virtue rather than a vice in this case. The jury did not have before it anything that Mr. Belisle generated; thus, Appellant cannot argue that Dr. Armstrong was simply acting as a surrogate for another's work when that work never came before the jury. *See id.* at 517 ("The admission of a lab report created solely by a non-testifying analyst, without calling that analyst to sponsor it, violates the Confrontation Clause.").

Finally, an expert can rely on the work of others, so long as the opinions offered are those of the witness: "For an expert's testimony based upon forensic analysis performed solely by a non-testifying analyst to be admissible, the testifying expert must testify about his or her own opinions and conclusions." *Id.* Again, prior to the admission of Dr. Armstrong's report, the following exchange occurred between the prosecutor and Dr. Armstrong:

> Q. Dr. Armstrong, *were you* able to analyze the results of the test on this particular substance, and *were you* able to come to a conclusion as to what substance was contained inside State's Exhibit 10 [the container with the sample tested]?

19

A. Yes, ma'am. [Emphasis added.]

Nothing in the record rebuts this testimony that Dr. Armstrong offered his own conclusions based on the type of nontestimonial test results that he could rely on without triggering a Confrontation Clause violation. Appellant never mentions this testimony, much less attempts to explain how in the face of this testimony the trial court abused its discretion by overruling his Confrontation Clause objection.

The State aptly summarizes as follows why Appellant's confrontation rights were not violated, and we agree with that summary:

> In sum, Dr. Armstrong's expert testimony conformed to the three general principles articulated by the Court of Criminal Appeals in *Paredes*. *See* . . . 462 S.W.3d at 517–18. No lab report prepared by the nontestifying technician was admitted; Dr. Armstrong did not testify in any detail to the contents of the readout from the gas chromatograph; and Dr. Armstrong testified to his own interpretations of the test results and the conclusions he drew from them in light of his experience. *Id.* . . . Therefore, Appellant's right to confront witnesses against him was honored in regard to Dr. Armstrong's testimony and report.

We overrule Appellant's sole point.

## IV. Conclusion

Having held that the trial court did not abuse its discretion by overruling Appellant's Confrontation Clause objection to the testimony of Dr. Armstrong, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 9, 2023